ORIGINAL

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

FILED-USDC-NDTX-DA
'25 FEB 10 PM 1:20
KM

JENNIFER L. RYAN,

      Plaintiff,

v.

UNITED STATES DEPARTMENT OF
JUSTICE
and KAREN E. ROCHLIN,

      Defendants.

3-25 CV 0325 - X

CIVIL ACTION NO. _____

**JURY TRIAL DEMANDED**

---

### PETITION FOR REDRESS OF GRIEVANCES AND DAMAGES
### ARISING FROM WRONGFUL PROSECUTION

TO THE HONORABLE JUDGE OF SAID COURT:

      COMES NOW JENNIFER RYAN, Plaintiff, and respectfully moves this Honorable Court to consider

Plaintiff's redress of grievances and damages arising from wrongful prosecution. In support thereof, Plaintiffs

state as follows:

### INTRODUCTION

1. Plaintiff, Jennifer L. Ryan, brings this action against the United States Department of Justice (DOJ) and

      former federal prosecutor Karen E. Rochlin for wrongful prosecution, prosecutorial misconduct,

      violations of constitutional rights, and damages suffered as a result of politically motivated and unlawful

      legal actions taken against her.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1346 (actions against the United States).

4. Venue is proper in the Northern District of Texas under 28 U.S.C. § 1391(b) because:

   - Plaintiff resides in this district, and a substantial part of the harm and impact of the wrongful prosecution was felt here.

   - Plaintiff's reputation, career, and economic opportunities were harmed in Texas due to Defendants' wrongful actions.

   - Plaintiff is pursuing related federal criminal complaints in the District of Columbia against Defendant Rochlin and the presiding judge for misconduct, constitutional violations, and civil rights violations.

## FACTUAL BACKGROUND

5. Plaintiff was prosecuted by the DOJ for misdemeanor offenses arising from her presence at the U.S. Capitol on January 6, 2021.

6. Karen E. Rochlin was terminated from her position as a federal prosecutor, a decision which aligns with the serious misconduct alleged in this case.

7. Defendant Rochlin, in her capacity as a federal prosecutor, engaged in multiple acts of prosecutorial misconduct, including but not limited to:

   o Making false statements in court regarding Plaintiff's cooperation with federal authorities; (Exhibit "A")

o Misrepresenting evidence to exaggerate Plaintiff's role in the events;

o Improperly relying on Plaintiff's public statements and social media activity as a basis for sentencing, violating First Amendment protections;

o Advocating for a harsher sentence based on Plaintiff's perceived lack of remorse, rather than legal or factual justification;

o Ignoring exculpatory evidence that demonstrated Plaintiff's minimal role in the events of January 6, 2021.

o Unfair use of irrelevant information about Plaintiff's career, public influence, and personal background to justify a harsher sentence;

o Making false statements about Plaintiff in court and in sentencing memorandum (Exhibit "B");

o Making false claims about Plaintiff's conduct without supporting evidence or corroboration;

o Arguing for a heavier sentence based on Plaintiff's thoughts, beliefs, and protected speech rather than actual conduct.

o Conflating Plaintiff's conduct with the broader riot and improperly attributing blame for the entire event to Plaintiff, despite her minimal role.

o Arguing for Plaintiff to receive the harshest sentence at the time for any peaceful protester charged with a misdemeanor offense, demonstrating disproportionate punishment and politically motivated prosecution.

o Overcharging Plaintiff with four separate misdemeanors despite only being inside the Capitol for two minutes and engaging in no violence, destruction, or resistance. This excessive charging demonstrates an intent to punish Plaintiff beyond the scope of her actual conduct and was not consistent with the treatment of similarly situated defendants.

- ○ The DOJ submitted an excessive 28-page sentencing memorandum filled with inflammatory and misleading statements, mischaracterizations of Plaintiff's actions, and references to protected speech in an attempt to justify an extreme and unjustified punishment.

- ○ The sentencing recommendation sought to paint Plaintiff as a significant threat despite the government's own admission that Plaintiff engaged in no violence.

- ○ Karen E. Rochlin improperly used private text messages between Plaintiff and her dying mother in the sentencing memorandum and in open court, despite their irrelevance to the case. This was an egregious attempt to emotionally manipulate the court and publicly humiliate Plaintiff.

8. Plaintiff cooperated fully with authorities, including voluntarily providing electronic devices and passwords without the need for a search warrant, contrary to the government's representations in court.

9. Defendant Karen E. Rochlin was assigned to the case at the last minute, after Plaintiff had already signed the plea agreement, significantly altering the prosecution's approach to sentencing. Rochlin denied this well documented fact in open court.

10. Prior to Rochlin's involvement, Plaintiff had been informed that the former prosecutor would be recommending probation, and the Presentence Investigation Report (PSR) also recommended probation.

11. Despite these recommendations, Defendant Rochlin aggressively argued for a prison sentence, disregarding the PSR's findings and the original prosecutor's assessment.

12. Rochlin's push for incarceration was not based on any new evidence but instead appeared to be a politically motivated decision to punish Plaintiff beyond the scope of her actual conduct.

13. The prosecution of Plaintiff was politically motivated, targeting her based on her influence, public profile, and protected speech, rather than on the merits of her case.

14. The Court, in issuing its sentence, heavily relied on the government's mischaracterization of Plaintiff's actions, imposing an unjust and excessive punishment based on improper considerations.

15. The Court, in sentencing Plaintiff, admitted that Plaintiff was a peaceful protester and that all speech made on the day was protected under the First Amendment. Despite this acknowledgment, the government improperly used Plaintiff's speech and public influence as factors to argue for a harsher sentence, violating fundamental constitutional protections.

## LEGAL CLAIMS

### COUNT I - SELECTIVE PROSECUTION

16. Defendants unlawfully and improperly targeted Plaintiff based on her political beliefs and public statements, in violation of the Equal Protection Clause of the Fifth Amendment.

17. Other similarly situated individuals received lesser punishments or were not prosecuted at all, demonstrating discriminatory enforcement of the law.

18. Legal Precedents:

- *Wayte v. United States, 470 U.S. 598 (1985)* – Established that selective prosecution claims require proof that the government targeted an individual based on impermissible factors, such as political expression.

- *United States v. Steele, 461 F.2d 1148 (9th Cir. 1972)* – Affirmed that selective prosecution violates constitutional protections when individuals are singled out for prosecution while others similarly situated are not charged.

- *United States v. Steele*, 461 F.2d 1148 (9th Cir. 1972) – Selective prosecution violates the Equal Protection Clause when the government unfairly targets certain individuals while leaving similarly situated people unpunished.

- *Branti v. Finkel*, 445 U.S. 507 (1980) – The government cannot punish individuals based on their political beliefs or affiliations.

- *Bush v. Gore*, 531 U.S. 98 (2000) – The Equal Protection Clause applies to all individuals regardless of public status, reinforcing that government actors cannot selectively impose penalties.

- *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) – Established that public figures do not lose fundamental constitutional rights because of their prominence.

## COUNT II - FIRST AMENDMENT RETALIATION

19. Defendants unlawfully targeted, punished, and sought to silence Plaintiff for exercising her First Amendment rights, using public speech, social media activity, and media interviews against her during prosecution and sentencing.

20. Defendants unlawfully targeted, punished, and sought to silence Plaintiff for exercising her First Amendment rights, using public speech, social media activity, and media interviews against her during prosecution and sentencing.

- The government weaponized the criminal justice system to retaliate against Plaintiff for constitutionally protected political speech.
- Prosecutor Karen E. Rochlin explicitly used Plaintiff's public statements as justification for a harsher sentence, violating clear constitutional protections against viewpoint discrimination.
- Defendants' actions were designed to set a chilling precedent—to make an example of Plaintiff and intimidate others from expressing similar views, constituting an abuse of prosecutorial discretion.

- No direct criminal conduct was proven to support an aggravated sentence; instead, punishment was disproportionately based on speech and public visibility, violating fundamental constitutional protections.

- Defendants conflated Plaintiff's political speech and social media activity with criminal conduct, despite no direct evidence linking speech to illegal actions, demonstrating clear retaliatory intent.

21. Legal Precedents:

  ○ *Hartman v. Moore*, 547 U.S. 250 (2006) – Established that plaintiffs must show retaliatory prosecution was motivated by speech and lacked probable cause. In this case, Plaintiff's public speech was weaponized to justify an excessive prosecution and punishment.

  ○ *United States v. Alvarez*, 567 U.S. 709 (2012) – Confirmed strong protections for free speech under the First Amendment, even when speech is controversial or unpopular. The DOJ unlawfully targeted Plaintiff's speech, violating this constitutional precedent.

  ○ *Texas v. Johnson*, 491 U.S. 397 (1989) – Reinforced that the government cannot punish individuals for expressive conduct simply because it disagrees with their message. Plaintiff's political speech and media statements were wrongly used as grounds for harsher punishment.

  ○ *Brandenburg v. Ohio*, 395 U.S. 444 (1969) – Established that speech can only be criminalized if it incites imminent lawless action. Plaintiff's public statements did not incite violence or lawlessness, yet were treated as aggravating factors for sentencing.

  ○ *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) – Prohibited content-based discrimination in legal penalties—the government cannot punish speech more harshly based on its content or viewpoint, as was done in Plaintiff's case.

- *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019) – Confirmed that government officials violate the First Amendment when retaliating against individuals for protected speech. The DOJ's focus on Plaintiff's public speech rather than actual criminal conduct demonstrates clear retaliation.

- *Elrod v. Burns*, 427 U.S. 347 (1976) – Established that punishing individuals for their political beliefs violates First Amendment protections. The government's treatment of Plaintiff was designed to suppress political speech through intimidation and retaliation.

- *New York Times Co. v. United States*, 403 U.S. 713 (1971) (Pentagon Papers Case) – Emphasized government overreach in attempting to suppress free speech under the guise of national security or public order concerns. Plaintiff's speech was criminalized despite constitutional protections.

## **COUNT III - PROSECUTORIAL MISCONDUCT**

22. Defendant Rochlin engaged in false representations, omissions of material facts, and unethical conduct that resulted in Plaintiff receiving an unfair and excessive sentence.

23. The DOJ failed in its duty to ensure a fair and impartial prosecution, violating Plaintiff's constitutional right to due process.

24. Defendant, Karen E. Rochlin, was subsequently dismissed from her position as a federal prosecutor, which further demonstrates the extent of misconduct and lack of ethical integrity in her actions against Plaintiff.

25. Defendant, Karen E. Rochlin, engaged in unethical conduct by introducing irrelevant, outdated, and misleading information about Plaintiff's personal and financial history—information that had no bearing on the case but was presented to defame Plaintiff, damage her credibility, and prejudice the court against her.

26. Karen E. Rochlin engaged in unethical conduct by introducing private text messages between Plaintiff and her dying mother in both the sentencing memorandum and in open court, despite their complete irrelevance to the charges. This was done solely to manipulate the court, inflict emotional distress on Plaintiff, and paint an unjust and false picture of her character.

27. Defendant Rochlin was assigned to the case at the last minute, after Plaintiff had already signed the plea agreement, significantly altering the prosecution's approach to sentencing.

28. Prior to Rochlin's involvement, Plaintiff had been informed that the former prosecutor would recommend probation, and the Presentence Investigation Report (PSR) also recommended probation.

29. Despite these recommendations, Defendant Rochlin aggressively argued for a prison sentence, disregarding the PSR's findings and the original prosecutor's assessment.

30. By disregarding the PSR recommendation and established sentencing standards, Defendant Rochlin engaged in arbitrary and capricious conduct that violated Plaintiff's right to fair treatment under the law.

31. Legal Precedents:

- *Napue v. Illinois, 360 U.S. 264 (1959)* – Established that a conviction obtained through false testimony violates due process.
- *Giglio v. United States, 405 U.S. 150 (1972)* – Held that prosecutors have an obligation to ensure fair proceedings and disclose all relevant information.
- *Brady v. Maryland*, 373 U.S. 83 (1963) – Established that withholding material exculpatory evidence violates due process.

- *United States v. Agurs*, 427 U.S. 97 (1976) – Expanded *Brady v. Maryland*, holding that even if a prosecutor does not deliberately withhold evidence, failing to disclose information that could have changed the trial outcome is a constitutional violation.

- *Kyles v. Whitley*, 514 U.S. 419 (1995) – Reinforced *Brady v. Maryland,* holding that a prosecutor's duty extends beyond avoiding perjury—they must not mislead the court or jury in any way.

- *Berger v. United States*, 295 U.S. 78 (1935) – Established that a prosecutor's duty is to seek justice, not merely to convict. This case condemns prosecutors who manipulate the truth, introduce improper arguments, or engage in prejudicial conduct.

- *United States v. Schell*, 775 F.2d 559 (4th Cir. 1985) – Ruled that using prejudicial evidence irrelevant to the defendant's guilt or conduct can result in a due process violation.

- *United States v. Smith*, 740 F.2d 734 (9th Cir. 1984) – Found that prosecutorial arguments based on personal attacks, exaggerations, and prejudicial statements violate due process and require reversal.

- *United States v. Young*, 470 U.S. 1 (1985) – Held that a prosecutor's improper arguments, if they create unfair prejudice against the defendant, warrant reversal of a conviction or sentence.

- *United States v. LaBonte*, 520 U.S. 751 (1997) – Held that sentencing recommendations should be made in accordance with objective guidelines, not arbitrary prosecutorial discretion.

## COUNT IV - VIOLATION OF DUE PROCESS (FIFTH AMENDMENT)

32. Plaintiff was denied a fair and impartial sentencing process, as the court relied on improper factors, including speech and media presence, in determining her punishment.

33. The DOJ and Karen E. Rochlin misrepresented facts and omitted key evidence, violating Plaintiff's fundamental rights under the Fifth Amendment.

34. Karen E. Rochlin's use of Plaintiff's deeply personal text messages with her dying mother violated Plaintiff's fundamental right to a fair sentencing process, improperly introducing irrelevant and prejudicial information to sway the court.

35. Legal Precedents:

- *Brady v. Maryland, 373 U.S. 83 (1963)* – Established that withholding exculpatory evidence violates due process.
- *United States v. Agurs, 427 U.S. 97 (1976)* – Expanded Brady, requiring disclosure of evidence material to the defense.
- *Bearden v. Georgia*, 461 U.S. 660 (1983) – A court cannot impose harsher punishments based on personal financial status or public influence.
- *United States v. Windsor*, 570 U.S. 744 (2013) – Government actors must apply laws fairly and equally, even when dealing with politically sensitive or controversial individuals.
- *Skinner v. Oklahoma*, 316 U.S. 535 (1942) – The Equal Protection Clause prohibits disproportionate punishments based on classifications unrelated to the offense.
- *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) – Established class-of-one equal protection claims, confirming that the government cannot single out individuals for disparate treatment without justification.
- *United States v. Armstrong*, 517 U.S. 456 (1996) – Selective prosecution based on impermissible factors violates equal protection, even if the defendant is a public figure.

## COUNT V - CONSPIRACY AGAINST RIGHTS (18 U.S.C. § 241)

36. Defendants conspired to deprive Plaintiff of her constitutional rights, including her right to free speech, equal protection, and due process, by engaging in a wrongful prosecution based on political motives and public influence.

- The use of false statements, selective prosecution, and excessive punishment demonstrates an orchestrated effort to punish Plaintiff beyond the scope of the law due to her political beliefs.
- The President of the United States has publicly confirmed that prosecutors like Karen Rochlin were terminated for engaging in wrongful prosecutions, to further substantiate this claim.
- This conspiracy extends beyond individual misconduct and highlights a wider systemic abuse within the DOJ, wherein Plaintiff and similarly situated individuals were targeted disproportionately to suppress dissent and public speech.

37. Legal Precedents:

- *United States v. Price*, 383 U.S. 787 (1966) – Defined conspiracy against rights and affirmed that officials who conspire to deprive individuals of their constitutional rights can be held liable. This case supports the claim that DOJ actors and Karen Rochlin engaged in a coordinated effort to wrongfully target Plaintiff based on unconstitutional grounds.
- *Griffin v. Breckenridge*, 403 U.S. 88 (1971) – Recognized civil liability for conspiracies to violate constitutional rights when private or public actors work together to unlawfully suppress an individual's rights. This applies to the DOJ's collusion in selective prosecution against Plaintiff.
- *Dennis v. Sparks*, 449 U.S. 24 (1980) – Held that government officials acting in concert with others to deprive someone of constitutional rights can be held accountable under civil conspiracy claims. This

supports Plaintiff's claim that Rochlin and other DOJ actors worked together to selectively prosecute

and punish Plaintiff.

- *United States v. Lanier*, 520 U.S. 259 (1997) – Affirmed that government officials can be held criminally liable for depriving individuals of constitutional rights when their conduct is egregious and politically motivated. This supports Plaintiff's argument that Rochlin's actions were not only wrongful but reached a level of abuse warranting criminal and civil accountability.

- *Briscoe v. LaHue*, 460 U.S. 325 (1983) – Held that prosecutors and law enforcement officials do not have absolute immunity when they knowingly present false testimony or misleading arguments in court to justify wrongful convictions or punishments. This case supports Plaintiff's argument that Rochlin used misleading and irrelevant evidence to justify excessive sentencing.

- *United States v. Classic*, 313 U.S. 299 (1941) – Recognized that government officials who deprive individuals of constitutionally protected rights, including the right to a fair trial, due process, and equal protection, can be criminally liable. This further supports Plaintiff's claim of politically motivated prosecution.

- *Yick Wo v. Hopkins*, 118 U.S. 356 (1886) – Established that laws must be applied equally and cannot be used to selectively target individuals based on race, political affiliation, or public status. This supports Plaintiff's claim that similarly situated defendants were treated more leniently, while Plaintiff was prosecuted more aggressively due to public influence.

## COUNT VI – BIVENS CLAIM FOR FIRST AMENDMENT VIOLATION

(Against Defendant Rochlin in her Individual Capacity)

38. Under Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971), Plaintiff brings a claim for violation of her First Amendment rights.

39. Defendant Rochlin, acting under color of federal authority, retaliated against Plaintiff's protected speech by using it as an aggravating sentencing factor.

40. This is a clear First Amendment violation, as federal officials cannot prosecute or impose penalties based on speech content (*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992)).

41. Defendant Rochlin's conduct chilled Plaintiff's free speech, violating her constitutional rights.

## COUNT VII – BIVENS CLAIM FOR FIFTH AMENDMENT VIOLATION

(Against Defendant Rochlin & DOJ)

42. Under Bivens, Plaintiff alleges violations of her due process rights under the Fifth Amendment.

43. Defendant Rochlin intentionally misrepresented facts during sentencing to impose a disproportionate and politically motivated sentence.

44. The DOJ failed to prevent its prosecutor from using unconstitutional factors in sentencing.

45. Plaintiff was denied equal protection, as other similarly situated defendants received lesser or no sentences for the same misdemeanor offense.

## COUNT VIII – DEPRIVATION OF RIGHTS UNDER COLOR OF LAW (18 U.S.C. § 242)

(Against Defendant Rochlin)

46. Defendant Rochlin knowingly deprived Plaintiff of her constitutional rights by using her speech and public influence as sentencing factors.

47. This constitutes deprivation of rights under color of law (18 U.S.C. § 242), a criminal offense.

48. The DOJ's failure to correct this abuse amounts to willful negligence in supervising its prosecutors.

## COUNT IX – DEFAMATION & FALSE LIGHT

49. Defendant Karen E. Rochlin knowingly and maliciously made false and misleading statements about Plaintiff in open court and in court filings, including:

- Irrelevant and outdated financial information, including references to Plaintiff's tax debt from 2016.
- A defamation lawsuit Plaintiff won on or about 2007, misrepresenting its relevance to the present case.
- Charges from over 30 years ago, which were not connected to the case and had no legal bearing on the prosecution.
- Defendant, Karen Rochlin, twisted Plaintiff's private information garnered in the PSR Report, including her past traumatic childhood experiences, and even used Plaintiff's resilience in overcoming said experiences as evidence that Plaintiff deserved a more harsh sentence.

50. These statements were intended to publicly shame, damage Plaintiff's credibility, and incite public ridicule, rather than serve a legitimate prosecutorial purpose.

51. Defendant Rochlin made these statements with actual malice, knowing they were irrelevant and intended to falsely portray Plaintiff as an untrustworthy individual in violation of Plaintiff's constitutional rights.

52. Plaintiff's reputation was severely damaged by these statements, as they were picked up by national media and resulted in additional public and financial harm.

53. Defendant's conduct constitutes defamation (under applicable state and federal laws) and false light invasion of privacy, entitling Plaintiff to compensatory and punitive damages

54. Legal Precedents:

- *New York Times Co. v. Sullivan, 376 U.S. 254 (1964)* – Established the actual malice standard for defamation claims involving public figures.

- *Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974)* – Defined defamation and false light claims for private individuals subjected to reputational harm.

## **DAMAGES AND RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

1. Compensatory damages in an amount to be determined at trial, for financial losses, reputational harm, emotional distress, and legal costs incurred due to Defendants' wrongful actions.

2. Punitive damages to deter future wrongful prosecutions and hold Defendants accountable for their misconduct.

3. A declaratory judgment that Plaintiff's prosecution was unconstitutional and violated her rights.

4. An injunction preventing future politically motivated prosecutions by the DOJ against similarly situated individuals.

5. Any further relief that this Court deems just and appropriate.

# DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues triable by law.

Respectfully submitted,

Jennifer L. Ryan
407 E. Tyler St.
Richardson, TX 75081
469-491-0587
jennaryanrealty@gmail.com

Pro Se Plaintiff

**CERTIFICATE OF SERVICE**

I, Jennifer L. Ryan, Plaintiff in the above-captioned case, hereby certify that on this February 10, 2025, a true and correct copy of the Petition for Redress of Grievances and Damages Arising from Wrongful Prosecution was served upon the Defendants listed below, in compliance with Federal Rule of Civil Procedure 4(i) and applicable service of process rules.

Pursuant to Fed. R. Civ. P. 4(i)(1), service was made by Certified Mail, Return Receipt Requested, to:

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

Pursuant to Fed. R. Civ. P. 4(e), service was made by Certified Mail, Return Receipt Requested, to:

Karen E. Rochlin, Esq.
1900 Purdy Ave #1408
Miami Beach, FL 33139

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Dated: February 10, 2025

Respectfully submitted,

Jennifer L. Ryan

*Exhibit A*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00050 (CRC)** |
| **v.** | : | |
| | : | |
| **JENNIFER LEIGH RYAN,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Jennifer Leigh Ryan to a 60-day term of incarceration and $500 in restitution.

### I.   Introduction

For more than a decade, Defendant Jennifer Leigh Ryan ("the defendant") has promoted her personal brand, touting her success as a real estate broker, self-help coach, and media personality. As a self-described "influencer," the defendant broadcasts over various platforms, including social media, Youtube, and radio, garnering thousands of followers and millions of views. *See* PreSentence Investigation Report ("PSR") at ¶¶ 768, 79. On January 6, 2021, the defendant enthusiastically participated in the attack on the United States Capitol while sharing the experience with her followers. Throughout the day, she posted and live-streamed her activity, publicly cheerleading a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than a million dollars' worth of property damage.

1

The defendant pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating or Picketing in a Capitol Building.  gAs explained herein, a custodial sentence is appropriate in this case for numerous reasons.

First, the defendant was aware that January 6 could be and did become violent.  Hours before any mob formed at the Capitol, the defendant broadcast repeated statements that the day was a "prelude" to "war."  Before deciding to join others at the Capitol, the defendant received and read a forwarded tweet reporting that rioters had breached barriers, caused destruction, and overwhelmed police.  Minutes later, from her hotel, she streamed on Facebook Live that "we're gonna go down and storm the Capitol; they're down there right now and that's why we came [.]"  As she left the hotel, she streamed, "I'm kinda freakin' out.  Because I'm going to war."

Second, as she arrived at the Capitol, the defendant continued to promote violence.  She posted a recording of herself stating that "we're all gonna be up here, we're gonna be breakin' those windows, we're gonna be havin' to deal with the tear bombs" and proclaiming, as she approached the East Rotunda door, "Life or death, it doesn't matter, here we go."  After entering the Capitol, the defendant stood inside the Rotunda lobby while another rioter shouted to others to "go to [Speaker of the House Nancy] Pelosi's office and destroy it," after which the defendant joined shouts to "Fight for Trump" before chemical irritants caused her to retreat from the building.

Third, the defendant's participation in the riot included more than a brief entry into and exit from the Capitol Building itself.  Although she left the Capitol interior after only a few minutes, the defendant recorded herself near the building's exterior between 3:37 and 4:22 p.m. as she encouraged others to enter, shouted "we're pushing our way in," chanted "Hang Mike Pence," and observed that "really, we could go in there" and "the military's not gonna come."

2

Fourth, the defendant promoted additional violence beyond the Capitol, tweeting a photograph of a broken window captioned with a threat that "if the news doesn't stop lying about us we're going to come after their studios next . . ." (ellipsis in original). Minutes later, the defendant posted another tweet about the "cool moment" when a crowd that included her codefendant damaged press equipment at a media enclosure on the Capitol grounds.

Fifth, after the riot, the defendant publicly and repeatedly communicated a lack of remorse. In multiple television interviews and in subsequent social media postings that include a smiling self-portrait beside the broken Capitol window described above, and a tweet that January 6 was the "best day of my life." In a personal message from January 12, 2021 that was recovered from her cellular phone, she claimed "I deserve a medal for what I did."[1] In an interview with Spectrum News recorded on January 8, 2021 and aired the following week, the defendant stated she "did not regret" her actions at the Capitol.[2] In an interview recorded on or about January 13, 2021 with Cynthia McFadden of NBC News, the defendant explained that she felt "like a martyr" and had "no guilt in my heart." In an interview with Fox News, the defendant described her presence on January 6 as "something noble." At the end of a tweet posted on March 26, 2021, the defendant stated "I did nothing wrong."

Sixth, the defendant actively and widely spread false information on social and traditional media that falsely downplayed or even denied the violence on January 6. The day after the riot,

---

[1] The defendant sent similar messages to various contacts. On January 8, 2021 at 10:29 a.m., she wrote to the group she accompanied to the Capitol, "We did nothing wrong." On January 9, 2021, two messages sent at 11:27 stated "I was standing up for my country" followed with "And I'm proud;" A message from January 10, 2021 at 7:24 p.m. to a reporter states "I hope you don't make me look bad but I really didn't do anything wrong . . .". On January 12, 2021 at 11:19 p.m., she wrote "And also I'm so proud of myself because I have balls of steel I'm f***ing where is the capital [sic];" and at 10:27 p.m., "I was so honest I said I'm storming the capital and I didn't hide it I made it public."

[2] *See* https://www.youtube.com/watch?v=wm7EjLmeWjA (at 5:10 minutes).

3

despite her earlier forecasts of "war", her references to storming the Capitol, her observation of rioters breaking windows, her participation in chants of "Hang Mike Pence," her excitement that "we are pushing our way in" to the Capitol, her knowledge of a crowd destroying media equipment, and her knowledge of at least one fatality, on January 7, 2021 the defendant tweeted that "We were not violent. . . . We were peaceful." In the McFadden interview, the defendant claimed that "violence did not cross my mind." In a series of messages replying to inquiries from a reporter, on January 7, 2021 the defendant wrote: "Assault?" "That's fake news." "Riot?" "We were marching for freedom" and "It was so peaceful if you hadn't been there I have video of it all." In her Spectrum News interview, the defendant obscured her own knowledge of violence, stating that she did not personally break any windows.

Seventh, the defendant also provided false information about the extent of her own conduct. In her Spectrum interview, she claimed, referring to the Capitol, "we didn't really want to go in there."[3] In personal messages, she denied entering the Capitol at all. To Spectrum, she claimed that she was "at the doorframe but no further." In her pre-sentence interview with Probation, she falsely maintained that she did not even know there was a riot when she arrived at the Capitol. PSR ¶ 29.

Eighth, not only during the riot, but in its aftermath, the defendant sought to exploit her presence during the attack on the Capitol for profit. In the midst of a riot meant to disrupt the certification of a presidential election, the defendant chose to promote her real estate business, boasting that "I will f***ing sell your house." In messages sent one week later, the defendant

---

[3] In contrast, the defendant recorded herself in her hotel room watching Fox news and exclaiming "they're climbing the walls of the Capitol" and "we're going to get them out of their chairs."

contemplated the business she needed to prepare for as a result of the publicity she received from joining the mob at the Capitol.

Ninth, the defendant's post-arrest conduct includes public statements made months after her arrest reflecting a belief that she is immune from punishment because of her appearance and social status, and a personal message that she will get off "Scott free." The sense of impunity in these statements demonstrates a need for specific deterrence in this defendant's case, and reflects that she fails to appreciate the seriousness of her conduct or the charges against her.

Despite the foregoing, the defendant's background may suggest some reasons for leniency. Her family history was troubled. She has entered a guilty plea and accepted responsibility for at least her physical presence inside of the Capitol. The defendant does have a criminal history, although it is dated and consists of misdemeanor convictions. Nevertheless, the defendant's participation in a riot that actually succeeded in delaying the Congressional certification combined with her promotion and celebration of violence, her consistent and public lack of remorse, her dishonesty and sense of impunity, her mercenary exploitation of the riot, and her greater potential to incite future violence renders a custodial sentence both necessary and appropriate in this case.

## II. Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 39 (Statement of Offense), at 1-5. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and d-estruction of that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety

5

of numbers.") (statement of Judge Chutkan). With that backdrop we turn to the defendant's
conduct and behavior on January 6.

*Jennifer Leigh Ryan's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, the defendant boarded a private plane chartered by a Facebook friend
and traveled with her codefendants and others from her home in Texas to Washington, D.C. to
attend the "Stop the Steal" rally. At approximately 7:00 a.m. on the morning of January 6, the
defendant streamed her walk to the rally on Facebook, commenting repeatedly that the rally was a
"preclude" to "war."[4] After attending the rally, the defendant and her group returned to their hotel
rooms.

At approximately 2:20 p.m., the defendant recorded herself in her hotel room watching Fox
News report the breach of the Capitol, exclaiming, "they're climbing the walls of the Capitol" and
"we're going to go down there because we've had it." At approximately 2:28 p.m., a member of
the defendant's group forwarded a tweet describing "Trump supporters" who "breached all
security barriers and are now actively destroying and occupying the Capitol building" and who
were "fighting federal police who are overrun." The image of this tweet was recovered from the

---

[4] At 1:20 minutes into the stream, (shortly after 7:00 a.m.), the defendant explains that she is there
because "they want to steal the election." At 4:19 minutes, she states that "protesting like this is a
prelude to when we're gonna go to war; we're gonna pack up our bags and we're gonna have this
fight." At 5:22 minutes, she states "this is a prelude to the war that is about to happen and we are
not messin' around there's a lot of us that are gonna be—there's more of us then there are of them,
we're gonna go right onto that . . .we're gonna let them know that they better frickin' listen to the
evidence today". At 14:23 minutes, the defendant states that "if it comes down to war guess what
I'm gonna be there I don't know what I'm gonna be doin' but I'm gonna be doin' something I
guarantee . . . I'm gonna be fightin' on the front lines wherever it is—yup--because I'm that kinda
girl and I think you should know it." Again, at 20:17 minutes, the defendant states that "you guys,
this is a prelude to going to war 'cause that's what's gonna have to happen if we do not win, we're
gonna be the ones, we're gonna be the first ones sayin' no. Nonononononononono. You get up off
your booties, get on your planes . . .". The repeated characterization of the morning rally as a
prelude to "war" foreshadows the violence at the Capitol that began hours later and forecloses any
claims that the defendant intended to support only a peaceful protest.

6

defendant's cellular phone with metadata showing that the message was read. At approximately 2:33 p.m., the defendant tweeted "We are here!!! We are taking it!!! There is [sic] more of us then there are of them." Minutes later, at approximately 1:41 p.m., the defendant streamed herself on Facebook from her hotel room stating: "We're going to go down and storm the Capitol. They're down there right now and that's why we came and that's what we're gonna do so wish me luck." At approximately 2:43 p.m., the defendant streamed herself on Facebook leaving her hotel room while saying "I'm kind of freaking out. Because I'm going to war."

Approaching the Capitol, the defendant continued filming herself, explaining, "We're all gonna be up here we're gonna be breakin' those windows, we're gonna be havin' to deal with the tear bombs . . ." She continued recording as she approached the entrance to the Capitol, proclaiming, "Life or death, it doesn't matter, here we go." At 3:21 p.m., the defendant entered the Capitol through the East Rotunda door with codefendant Jason Lee Hyland, as she streamed herself moving past broken windows while alarms audibly sounded. As the defendant entered, other exiting rioters streamed past her, commenting about tear gas in the air.



7

The defendant entered the Capitol, shouting "USA" and "in the name of Jesus." She asked Hyland about codefendant Katherine Staveley Schwab's location, and determined that Schwab was further ahead. As she recorded her intrusion into the Capitol for Facebook Live, the defendant also found it appropriate to promote her real estate business, announcing "You guys, will you believe this? I am not messing around. When I come to sell your house, this is what I will do. I will f***ing sell your house."[5]

The defendant declined to intrude as far as Schwab, anticipating that police would deploy tear gas and remarking, "I don't have any goggles." Individuals next to her commented that "I don't think they're spraying people till they get to those wooden doors," indicating doors further ahead, and "if you push hard enough they'll budge." The defendant responded, "Okay, let's just stand here." Separately, a third party recorded the defendant standing and recording inside the Capitol while a rioter shouted for the crowd to "go to Pelosi's office and destroy it."[6] The defendant then joined a chant to "Fight for Trump." At 3:23 p.m., the defendant began to exit from the inside of the Capitol.

At approximately 3:30 p.m., the defendant recorded herself on Facebook preaching near the East Rotunda door when another rioter interjected, "they're breaking the window over here, film that s***." The defendant went to the window indicated; however, the damage had been

---

[5] In a later message on January 11, 2021, the defendant also boasted, "And I'm becoming famous from this. And I'm getting lots and lots of business lined up for when all this blows over . . .". On January 13, 2021, she sent an electronic message that "Now I have an NBC news request as well as Forbes I'm gonna be in every magazine in the world" followed by "Get ready for some business[.]"

[6] In a 43-minute interview with Cynthia McFadden for the Today Show, the defendant acknowledged hearing "instigators that were trying to start chants and stuff." https://www.today.com/video/jenna-ryan-describes-the-moment-she-entered-the-capitol-january-6-99615813711 (last checked Oct. 11, 2021).

completed. The damage to that window matches the window in a photograph the defendant later tweeted, where she stands smiling and forming a "V" sign with her fingers.



At approximately 3:34 p.m., about eleven minutes after her exit from the Capitol's interior, the defendant continued to record herself and a crowd trying to force its way through the Rotunda door. In this recording, the defendant exclaimed "we're pushing our way in, we will fight to the death, I guarantee . . ." A minute or so later she remarked that she felt "a high like no other I have ever experienced." At approximately 3:36 p.m., the defendant joined chants of "Hang Mike Pence."

At approximately 4:18 p.m., the defendant moved to another location at the Capitol. At 4:22 p.m., the defendant recorded herself with Hyland and Schwab. In the recording, after exclaiming that she got "sprayed," the defendant repeats statements from other rioters that someone got shot, and continues, "We are having a war. This is the beginning of it. I hate to tell you. I hate to be on the front lines. That's the kind of people we're messin' with. They shot a 17-

9

year old with a real bullet . . . . They're breaking the windows now. I hear it. That's what happens. Whattaya gonna do, call the military? Ya think the military's gonna come? No. The military's not gonna come. Really we can go in there [the Capitol]."

Before leaving the Capitol grounds, the defendant, Schwab, and Hyland arrived at a press enclosure where the crowd attacked media equipment. Schwab joined the crowd's assault. A third party's video posted on Youtube shows codefendant Schwab kicking media equipment and throwing one piece of equipment on the ground. That evening the defendant posted a description on Twitter of "a cool moment" when "they just went to town on the AP equipment." She also tweeted a photo at 7:03 p.m. that night of the smashed equipment:



7:03 PM · Jan 6, 2021 · Twitter for iPhone

A few moments later, the defendant tweeted "I do have footage of people telling me not to go in [to the Capitol] because a lady just got shot and I said oh well. And all my friends we are 100% we didn't care we're here for the USA. Give me liberty or give me death. No joke."

For the defendant, the attack on the Capitol was "one of the best days of my life."



**dotJenna**
@dotjenna

... |

We just **stormed** the Capital. It was one
of the best days of my life.

3:42 PM · 1/6/21 · Twitter Web App

Following the riot, the defendant continued to make comments on various social media platforms minimizing and denying the violence that occurred, falsely minimizing her entry into the Capitol and denying that she engaged in any wrongdoing. In personal messages, the defendant initially denied entering the Capitol at all. In an interview recorded on January 8, 2021 for Spectrum news, the defendant claimed she got no further than the doorframe of an entrance into the Capitol building (at 2:48 minutes),[7] and there was no violence when she was at the Capitol because the police already had everything under control (at 3:55 mintues).[8] On January 11, 2021 in an instant message on Facebook, the defendant claimed falsely:

From: ▮         Jenna Ryan

Only took one step into the building

1/11/2021 8:45:41 PM(UTC-6).

In her 43-minute recorded interview with NBC's Cynthia McFadden, the defendant maintained that "I did not know I was breaking the law" (at 26:08 minutes); she did not really want to go to

---

[7] The Spectrum interview appears at https://www.youtube.com/watch?v=wm7EjLmeWjA.
[8] But compare the defendant's own recording from January 6 at 4:22 p.m., where the defendant comments on windows being broken, announces that a war is starting, and states "really we could go in there," referring to the Capitol, because "the military's not gonna come."

the Capitol (at 13:16 minutes); she felt "perfectly innocent in everything I have done" (at 23:56 minutes); and she wanted a pardon for all nonviolent January 6 protestors because "it's like a witch hunt" for a misdemeanor (at 31:30 minutes). In a January 13, 2021 interview with Fox News,[9] the defendant maintained that by joining the riot, "I was doing my duty." To her, January 6 "was a protest" and she stated "I do not feel that I did anything wrong; in fact, I felt that I did something noble and I'm proud of being there, I have no shame to be there; I feel very persecuted." As late as June, on the platform Gettr.com, the defendant blamed the same conduct that she had encouraged on the FBI and antifa.

Her comments prompted support from some and harsh criticism from others. In response to one critic suggesting she was going to jail, the defendant responded that she was "definitely not going to jail" because she has "blonde hair," "white skin," and a "great" job and future.[10]



**Jenna Ryan**
@dotjenna

Definitely not going to jail. Sorry I have blonde hair white skin a great job a great future and I'm not going to jail. Sorry to rain on your hater parade. I did nothing wrong
9:43 AM  Mar 26, 2021

### The Charges and Plea Agreement

On January 14, 2021, Jennifer Leigh Ryan was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On January 15, 2021, she surrendered to agents at the federal courthouse in Plano, Texas. On February 16, 2021, the defendant and her codefendants were charged by a four-count Superseding Information with

---

[9] The interview is available on YouTube at https://youtube.com/watch?v=gYssqp41DkU.

[10] This expression of impunity was not isolated. On January 12, 2021 at 11:30 p.m., the defendant wrote in a personal message from a gmail account: "Oh well I can always say I've done it all. I've done everything including having a criminal trial and getting off Scott free because I will get off anything to [sic] try to pin on me." Not surprisingly, in her January 13 interview with Fox News, the defendant stated that "I have no fear of getting arrested."

violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). ECF 18. A second superseding information against all defendants added an additional charge against Schwab and was filed on June 7, 2021. ECF 34. On August 19, 2021, the defendant pleaded guilty to Count Four of the Second Superseding Information which charged a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating or Picketing in a Capitol Building. ECF 38. In her plea agreement, the defendant agreed to pay $500 in restitution to the Department of the Treasury. *Id.* at 6.

### III.     Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment, PSR ¶ 99, a fine of up to $5,000, PSR ¶ 111, and a mandatory $10 special assessment, PSR ¶ 112. The defendant must also pay restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct,

§ 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of incarceration.

## A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each individual person who entered the Capitol on January 6 did so under the most extreme of circumstances. As a person entered the Capitol, each would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of the approach, each rioter also may have observed extensive fighting with law enforcement and, like the defendant, would have smelled chemical irritants in the air. Make no mistake, no rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited

Moreover, the defendant has not consistently paid her taxes, with a history of federal and state tax liens from 2013 and 2016 that caused a deficiency of more than $35,000 in back taxes that was not resolved until April, 2021. Despite her own history of tax delinquency, the defendant recorded herself, before release of tax liens on her own assets, on the Capitol steps declaring that she "was tired of paying taxes" to "crooks."

The PSR reports that the defendant had a difficult and traumatic childhood. According to the PSR, in the defendant's judgment, she has worked through that history. *See* PSR ¶66. On January 13, 2021 in messages with a concerned friend recovered from her cell phone, the defendant maintained "I don't need help" and "I'm Quite [sic] self sufficient." She has employment as a real estate agent, has worked as a life coach, and has been considered by herself and by others as an "influencer" who has successfully utilized radio and social media to establish a following. While the defendant's professional accomplishments can be commended, they do not excuse the offense she committed or offset its gravity. And in this case, the defendant's experience with, understanding of, and access to various media outlets such as radio, television, and social media casts her activity on January 6 in an even more disturbing light, because of both her increased ability to promote violence and to mislead the public about the events of January 6.

What might be the most troubling aspect of the defendant's character is her belief, stated explicitly, that she will not be held to account for her conduct. She publicly sought a presidential pardon for her crimes while also blaming others, such as the FBI and "antifa," for the violence and destruction of property that occurred on January 6 without acknowledging her own considerable contribution to the belligerence. Then, in March, she proclaimed on social media that because of her race, her appearance, and her economic position she would avoid incarceration. This belief that she will not face significant sanction simply because of who she is and regardless of whether

punishment is deserved means that there is little, while she persists in this belief, to deter the defendant from similar or additional wrongdoing. To be clear, the defendant is free to express her beliefs that she is unaccountable, no matter how offensively those beliefs are stated. But once expressed, this Court is free to consider her statements and beliefs in order to meet the statutory requirement to evaluate the defendant's characteristics and determine the need for a sentence that will deter the defendant and others from engaging in similar violations. Here, the defendant's sense of impunity, indifference to violence and denial of wrongdoing call for a custodial sentence.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[17] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases arising out of the riot on January 6, 2021, including in misdemeanor cases. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

Offenses that attack our democracy like the riot at the Capitol are rare, if not unprecedented. This defendant's sense of impunity is striking, not just because she explicitly holds herself above

---

[17] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

the law but because she believes that her social status and race protect her from accountability. Any sentence she receives, however, must promote respect for the rule of law that this defendant believes she can disregard on account of who she is. *Cf.* 28 U.S.C. § 994(d) (requiring the United States Sentencing Commission to assure that its guidelines and policy statements are "entirely neutral as to race, sex, national origin, creed and socioeconomic status of offenders"); *United States v. Lopez*, 938 F.2d  1293, 1297 (D.C. Cir. 1991) (observing that Congress intended to counter any suggestion that preferential treatment for defendants of a particular race or level of affluence was appropriate, or that defendants should face prison because they are poor or uneducated).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

#### *General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that

23

[the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Ample evidence shows a need for specific deterrence in this case. The defendant has continued to deny wrongdoing, even as recently as her September 2, 2021 interview with Probation in which she falsely denied knowledge that a riot was occurring at the Capitol before her arrival there. On social media and in television interviews, she has proclaimed that she did nothing wrong. Rather than acknowledge her own actions and choices, she has described "storming" the Capitol as justified and necessary. The defendant has not shown remorse. When contrasted with the sampling of statements in this paragraph, the reference in her written statement of September 10 to Probation that she is "not proud" about the "Capitol events" (which previously represented "the best day" of her life) can rightly be viewed with skepticism. *See Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("Mr. Mazzocco's remorse didn't come when he left the Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized

24

that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions"). Even if the defendant is found to be remorseful, her remorse did not develop quickly, and does not appear to be profound. It did not surface until months after her arrest and guilty plea in the form of a brief remark made to Probation on September 10. Thus, it should not carry great weight.

Perhaps the most compelling need for specific deterrence arises from the defendant's misguided belief that she is above the law, or at least insulated from incarceration. According to the defendant, she is:]

> Definitely not going to jail. Sorry I have blonde hair white skin a great job a great future and I'm not going to jail. . . . I did nothing wrong.

A defendant who believes she is immune from strict punishment because of her race and physical appearance may reoffend because the consequences for wrongdoing will never, in the defendant's mind, be severe even when severity is merited. Rather than hope for some chance the defendant will learn on her own that she is indeed accountable, this Court should impose accountability through a sentence that will refute the defendant's sense of impunity and thereby protect the public from the risk of her future crimes, *see* 18 U.S.C. § 3553(a)(C).

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on law enforcement officers, to conspiracy to corruptly interfering with Congress. Each offender must be sentenced based on their individual circumstances, but with the backdrop of January 6 in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting

a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lesser end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[18] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19.

While the number of sentenced defendants is low, we have already begun to see meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration, while those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home confinement. After a review of the applicable Section 3553(a) factors, the government believes that the defendant's conduct falls in the former category.

The defendant came to D.C. expecting violence and predicting "war;" publicized her intent to storm the Capitol; converged on the Capitol after learning rioters were there and excitedly broadcast that police were outnumbered; entered the Capitol and apparently left only after

---

[18] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its prior agreement to recommend probation in these cases. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

experiencing the effects of tear gas; celebrated the violence required to breach the Capitol; threatened and approved of violence outside the Capitol, particularly against the news media; showed no remorse in the months that followed and declared January 6 to be the best day of her life; spread false information to the public; lied to Probation; has a criminal history which demonstrates that fines and probationary sentences did not deter the defendant from misconduct in this case; does not consistently pay her taxes; and believes herself to be immune from punishment because of her appearance and socioeconomic status. Thus, this defendant should not be compared to those who obtained a home confinement or probationary sentence.

## V.    Conclusion

Sentencing here requires that the Court carefully balance the various factors set forth in 18 U.S.C. § 3553(a). As detailed above, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Jennifer Leigh Ryan to incarceration for 60 days and $500 in restitution. Such a sentence protects the community, promotes respect for the law, considers the failure of past probationary sentences to deter the instant offense, and deters future crime by imposing restrictions on her liberty as a consequence of her behavior, while recognizing her early plea of guilty and troubled past.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY


By:    *s/ Karen Rochlin*
       KAREN ROCHLIN
       DC Bar No. 394447
       Assistant United States Attorney Detailee
       U.S. Attorney's Office

27

99 N.E. 4th Street
Miami Florida 33132
(786) 972-9045
Karen.Rochlin@usdoj.gov

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2
        - - - - - - - - - - - - - - - - x        Exhibit "B"
 3      THE UNITED STATES OF AMERICA,
                                           Criminal Action No.
 4                    Plaintiff,           1:21-cr-00050-CRC
                                           Thursday, November 4, 2021
 5      vs.                                10:05 a.m.

 6      JENNIFER LEIGH RYAN,

 7                    Defendant.
        - - - - - - - - - - - - - - - - x
 8


 9      _____

10                    TRANSCRIPT OF SENTENCING
            HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                 UNITED STATES DISTRICT JUDGE
        _____

12

        APPEARANCES:
13


14      For the United States:         KAREN E. ROCHLIN, ESQ.
                                        DOJ-USAO
15                                      99 Northeast 4th Street
                                        Miami, FL 33132
16                                      (305) 961-9234
                                        karen.rochlin@usdoj.gov
17


18      For the Defendant:             GUY L. WOMACK, ESQ.
                                        GUY L. WOMACK, ATTORNEY AT LAW
19                                      609 Heights Blvd.
                                        Houston, TX 77007
20                                      (713) 224-8815
                                        guy.womack@usa.ne
21


22      Court Reporter:                Lisa A. Moreira, RDR, CRR
                                        Official Court Reporter
23                                      U.S. Courthouse, Room 6718
                                        333 Constitution Avenue, NW
24                                      Washington, DC  20001
                                        (202) 354-3187

25
```

1                    P R O C E E D I N G S

2          THE COURTROOM DEPUTY:  Good morning, everyone.

3  We're here for a sentencing in Criminal Case 21-50,

4  Defendant No. 1, *United States of America vs. Jennifer Leigh*

5  *Ryan*.

6          Starting with counsel for the government, if you

7  could please approach the lectern and identify yourself for

8  the record.

9          MR. ROCHLIN:  Good morning, Your Honor; Karen

10  Rochlin for the United States, and with me at counsel table

11  is Special Agent Amie Stemen from the Federal Bureau of

12  Investigation.

13          THE COURT:  Good morning, Ms. Rochlin.  You can

14  feel free to remove your mask at the podium, if you're

15  comfortable doing so.

16          MR. ROCHLIN:  Thank you, Your Honor.

17          THE COURT:  All right.

18          MR. WOMACK:  Good morning, Your Honor; Guy Womack

19  for Ms. Ryan.

20          THE COURT:  Good morning, Mr. Womack.  Nice to

21  meet you.

22          Ms. Ryan, good morning.  How are you feeling?

23          THE DEFENDANT:  All right.

24          THE COURT:  All right.

25          MR. WOMACK:  Your Honor, while we're sitting here

1    at the table, at counsel table, can we remove our mask as

2    well?  I will be easier to talk.

3                THE COURT:  You may.

4                MR. WOMACK:  Thank you, Your Honor.

5                THE COURTROOM DEPUTY:  When you speak, please make

6    sure you hit the microphone if you're going to speak from

7    counsel table.

8                MR. WOMACK:  I'm sorry.  I couldn't hear you.

9                THE COURTROOM DEPUTY:  If you're going to speak

10   from counsel table, make sure your microphone is on.  That's

11   all.  There's a microphone there.

12               Probation, if you can approach the lectern,

13   please.

14               THE PROBATION OFFICER:  Good morning, Your Honor;

15   Crystal Lustig from the probation office.

16               THE COURT:  Good morning, Ms. Lustig.

17               All right.  The Court has reviewed the presentence

18   investigation report, the memoranda submitted by both sides,

19   including the government's supplemental memorandum, the

20   videos cited in the government's memo, and the letter

21   submitted by Ms. Ryan.  Any other written materials for the

22   Court's consideration this morning?

23               MR. ROCHLIN:  Not from the United States, Your

24   Honor.

25               THE COURT:  And will the government be playing any

1     of the video clips this morning, or no?

2                    MR. ROCHLIN:  Your Honor, if I can be a little

3     indecisive about that?  It was my original plan, but I may

4     just need to see how things go.  I'm leaning towards not

5     right now, but if I think it would be of assistance, I may

6     change my mind, if the Court will indulge me.

7                    THE COURT:  That's up to you.

8                    Mr. Womack, any other materials?

9                    MR. WOMACK:  No, Your Honor.

10                    THE COURT:  All right.

11                    All right.  Ms. Ryan, has Mr. Womack reviewed the

12     presentence investigation report with you?

13                    THE DEFENDANT:  Yes, Your Honor.

14                    THE COURT:  And are you satisfied with his

15     services in this case?

16                    THE DEFENDANT:  Absolutely.

17                    THE COURT:  All right.  Just to start with the

18     factual summary of the offense and the defendant's

19     background in the PSR, any objections just to the factual

20     submission in the report?

21                    I'll tell you what, you all can just -- you can

22     stay at counsel table and just speak into the microphone

23     from counsel table, okay?

24                    MR. ROCHLIN:  Your Honor, the United States has no

25     objections to the final version of the presentence report.

1           THE COURT:  Okay.  Mr. Womack?

2           MR. WOMACK:  No objection, Your Honor.

3           THE COURT:  All right.  Ms. Ryan pled guilty to

4    one count of parading, demonstrating, or picketing in the

5    Capitol Building in violation of 40 USC 5104(e)(2)(G).  That

6    statute authorizes the Court to impose a term of

7    imprisonment of up to six months and a fine up to a maximum

8    of $5,000.  The statute does not authorize a term of

9    supervised release.

10          Pursuant to the plea agreement, the defendant has

11   agreed to pay restitution in the amount of $500 to the

12   Architect of the Capitol to help compensate for the damage

13   to the Capitol.  The offense is a Class B misdemeanor so the

14   federal sentencing guidelines do not apply.

15          Any objections?  Did I get that right, Counsel?

16          MR. ROCHLIN:  You did, Your Honor.

17          THE COURT:  Okay.  Mr. Womack --

18          MR. WOMACK:  Yes, Your Honor.

19          THE COURT:   -- any objections?

20          All right.  We've received a recommendation from

21   the probation office of a sentence of 24 months probation as

22   well as the $500 restitution payment.

23          Would the government like to address the 3553(a)

24   factors?

25          MR. ROCHLIN:  Yes, Your Honor.  Thank you.

1      Your Honor, I will try not to replow what I said

2   in the government's sentencing memorandum.  There are a few

3   things I will try to emphasize as briefly as I can.

4      The first is the unprecedented nature of what

5   happened on January 6th at the Capitol.  While I don't

6   want to belabor it, I do think it is important to note that

7   the facts of this offense -- I am not aware of anything

8   remotely similar in any other jurisdiction or in the recent

9   history of the United States where an angry mob breached the

10  Capitol with the intent of disrupting or overturning the

11  certification of the 2020 Presidential Election. There were

12  multitudes of people on the Capitol grounds and who entered

13  the Capitol.  Not all of them were alike, and that is

14  something that I am going to be focusing on as my remarks

15  continue.

16     I'm sure the Court has seen a lot about that day

17  so I won't belabor the specific details of what happened

18  where moment by moment, but regardless of how any individual

19  defendant has been charged, this was a serious event.  It

20  was a violent event.  It set in motion other events that

21  caused injury and loss of life and what many believe to be a

22  continuing injury to our democratic process, and I think

23  that is something that should be on one's mind when it comes

24  to evaluating the facts of this case.

25     The next thing I would like to emphasize, which is

1    touched on in the government's papers, is the fact that this

2    case is not about the First Amendment.  This is not about

3    prosecuting people for any belief that any individual holds

4    regardless of what that belief may be or which side of the

5    political line it lands.

6         The First Amendment is not unrestricted.  One can

7    famously not yell "fire" in a crowded theater when there is

8    no fire.  One cannot use the First Amendment to make

9    threats, to conspire, to commit a crime, to cause others to

10   commit injury.  There are -- or to defame, as this defendant

11   certainly recognizes having filed a defamation suit, which

12   she prevailed in.  Words in many contexts have consequences,

13   and the First Amendment is not an exit ramp from

14   accountability.

15        The United States is not prosecuting every single

16   individual who has a particular political point of view

17   associated with the events on January 6th.  We are

18   prosecuting people who broke the law based on evidence to

19   support that conclusion.  And it is in that context that we

20   ask the Court to impose a sentence on this particular

21   defendant based on the evidence that addresses not just the

22   offense, but what she did leading up to the offense, during

23   the offense, following the offense as part of her particular

24   history and characteristics, because those actions are one

25   part of a larger picture showing the serious nature of the

1    offense.

2          So when the United States focuses on statements of

3    the defendant, we do not contest the defendant's right or

4    the right of any individual to make certain statements.

5    Part of what we are saying is that the remarks, the social

6    media posts, the recordings that the United States has

7    referenced in its memorandum provide a window into the mind

8    of the person who made those statements and signify part of

9    what the ongoing offense of January 6th was all about.

10         THE COURT:  So the government has obviously

11   focused on many of Ms. Ryan's social media postings and

12   media interviews after January 6th.  She's obviously free to

13   make all of those statements.  The government argues that it

14   shows a lack of a true acceptance of responsibility and

15   remorse, and I guess my question is, what is the

16   relationship between those statements temporally and her

17   guilty plea?

18         She has now pled guilty and has accepted

19   responsibility, at least for the elements of that criminal

20   offense.  How should the Court view her prior social media

21   and media statements now that she has pled guilty and

22   accepted responsibility for that offense?

23         MR. ROCHLIN:  I apologize for the beeping, Your

24   Honor.  That was my computer shutting down, and I think I'm

25   going to give up on the technical aspect of my presentation

1   for today.

2          Your Honor, I think the Court should take those

3   statements into consideration for a number of reasons.

4   First, because it is true, and the government has

5   acknowledged that, yes, the defendant has pled guilty, and

6   she has, in what the government would consider to be a

7   limited fashion, accepted responsibility for what she has

8   done.

9          As I read the proffer supporting her plea

10  agreement and the statements of the defendant that were made

11  to probation and in her most recent letter to the Court, she

12  is acknowledging responsibility for her physical presence

13  inside of the United States Capitol.  What I don't see

14  acknowledgement of is the full context of the offense and

15  the rest of what she did; and so, therefore, the United

16  States feels it is appropriate to question the extent of

17  that acceptance, whether it is complete and whether -- I

18  think acceptance can be one thing, an admission of what one

19  has done and an acknowledgement of that fact.  And remorse

20  for what one -- for the conduct one is accepting is perhaps

21  a related but separate issue.  And the government, certain

22  protestations notwithstanding, does not see remorse.

23          So the statements that the government has

24  presented to the Court through its memorandum and through

25  the recordings themselves were made before the defendant's

1   plea of guilty.  I cannot point the Court to a -- well, I

2   cannot point the Court to a particular recording that has

3   occurred after the guilty plea.  I can point the Court to

4   the letter the defendant has written, which in many respects

5   the United States finds somewhat troubling and not fully

6   truthful.  And I would suggest to the Court that one way to

7   view acceptance is, if you'll allow me a metaphor that is

8   somewhat trite, to view it as something of a bubble.

9   Untruths relating to the offense may be something that

10  bursts that bubble.  So while there has been some acceptance

11  post-offense, when the defendant has been identified and

12  charged and is facing consequences, it can also be viewed in

13  that context.

14          THE COURT:  What in her letter is untrue?

15          MR. ROCHLIN:  Your Honor, the defendant insists,

16  for example, that she had no knowledge that there was

17  violence at the Capitol when she went there, and the United

18  States, or at least this prosecutor, simply cannot fathom

19  how that can be true given the evidence that the United

20  States has seen and discussed.

21          One of the reasons why we distinguish Ms. Ryan's

22  case from others is, first, because she went to the Capitol

23  not directly from the rally she attended not knowing what

24  was happening at the Capitol or would occur in the future

25  upon her arrival, but after she got back to her hotel room,

 1   after she observed a news broadcast reporting that people

 2   were, quote, climbing the walls at the Capitol.  She

 3   recorded herself in parts of that broadcast and knew and saw

 4   that people were climbing up the western side of the

 5   building at the what I assume is the lower west terrace,

 6   since that's easier to climb up towards the area of the

 7   scaffolding on that side of the Capitol.  There is, in the

 8   recording, very quickly, some visual about the interaction

 9   between the climbers and the police, and no right-thinking

10   person at the very least, and giving the defendant every

11   benefit of the doubt, could think that this was a normal way

12   to enter the Capitol, a proper way to enter the Capitol, a

13   peaceful way to enter the Capitol.

14           The defendant had that knowledge; that in effect

15   there was a mob at the Capitol; that there was a riot at the

16   Capitol; that people were not supposed to be at the Capitol;

17   and that is reinforced by a message the defendant received

18   that the United States has also referenced where there was a

19   forwarded text from a commentator describing, in his words

20   that I'm slightly paraphrasing, every barrier to the Capitol

21   has been breached.

22           THE COURT:  I saw that.  One question.  Who sent

23   her that Tweet?  Did that come from one of her co-defendants

24   in this case?

25           MR. ROCHLIN:  Your Honor, it came from a member in

1     the group that she traveled with, that she attended the

2     rally with, who has not been charged, and that is why the

3     United States has not identified that individual by name.

4           THE COURT:  The group was larger than the two co-

5     defendants and the defendant?

6           MR. ROCHLIN:  Yes, Your Honor.  There were two

7     additional individuals.

8           THE COURT:  Very well.  And were they all staying

9     at the same hotel?

10           MR. ROCHLIN:  Honestly, Your Honor, I don't have

11     direct knowledge if they were all staying at the same hotel.

12     I know the defendant and two others were.  And my assumption

13     is they were all staying at the same hotel, but I truly do

14     not want to say that without having something concrete that

15     I can point to.

16           THE COURT:  Very well.

17           MR. ROCHLIN:  So from the perspective of the

18     United States, Ms. Ryan had an off ramp.  She had good

19     reason not to go to the Capitol at all because there were

20     broadcasts of a riot, because while she was still in her

21     hotel room, based on the time stamp for the message, she

22     knew that police were overrun.  I think any rational adult

23     person would conclude that if police are being overrun it's

24     because they don't want you going where you're running.  She

25     went to the Capitol notwithstanding any of that.

1     She did arrive after a good part of the mob that

2    was engaging in the assault on the Capitol, and it is

3    entirely possible, when she approached the building from the

4    east side, that what she saw from her perspective on the

5    outside in that moment was not violent, was simply a group

6    of people in an area that she had every reason to know no

7    people were supposed to be.

8          THE COURT:  All right.  She passed a broken window

9    when she went in.

10          MR. ROCHLIN:  She passed a broken window, Your

11   Honor.  She passed through the sound of audible alarms.  She

12   passed people streaming out of the building.  And there is

13   at least one audible comment from somebody else referring to

14   pepper spray as people are streaming out and the defendant

15   is entering, and the defendant herself makes comment --

16   makes a comment as she enters and after she enters about

17   tear gas inside of the Capitol, and she's, from the sound of

18   it, concerned because she doesn't have goggles, and she

19   doesn't want to encounter the chemical irritants that the

20   police are deploying.

21          All of those things, Your Honor, again, I submit,

22   are clear indications that this is not someplace where it is

23   lawful or appropriate to be.

24          We also acknowledge that the defendant was not

25   inside the Capitol for a great length of time, although I'm

1    not sure in this context it's the best or strongest or most

2    accurate indicator of culpability because the reason that

3    the defendant herself gives for exiting when she did is,

4    again, because of the chemical irritants.  It's not because

5    she's overcome with remorse about being in the Capitol.

6    It's not because she recognizes that it's wrong for her to

7    be there.  She is uncomfortable there, and --

8              THE COURT:  Well, she's indicated otherwise in

9    other contexts.  She says she didn't feel comfortable.

10   She --

11             MR. ROCHLIN:  She didn't feel comfortable because

12   of the crowd, which, again, is not a recognition of the

13   impropriety of her presence.  It is not a recognition that

14   what she's doing is wrong.  It is not a recognition or any

15   kind of acknowledgement that the police are trying to make

16   the people who were there go away.  Most of her statements

17   in real time and even after the fact, in later Tweets and

18   other communications apart from the presence of the crowd,

19   reflect that the defendant left because of tear gas.

20             And when she left, Your Honor -- and this is

21   another distinguishing factor for the United States -- she

22   didn't go back to her hotel.  She didn't go to some other

23   part of the city.  She remained on the Capitol grounds, and

24   I would submit to the Court it is appropriate to consider

25   that conduct as well in evaluating the 3553(a) factors and

1    what sentence is appropriate in this case.

2         THE COURT:  And I reviewed a number of videos

3    yesterday, including the destruction of some of the media's

4    property outside of the Capitol, and the defendant is

5    pictured in that scrum of people.  That was after she

6    entered and left; am I correct?

7         MR. ROCHLIN:  As best I can place things on the

8    timeline, Your Honor, yes, that is my understanding; that

9    this was after she had left the Capitol, and she and one of

10   her co-defendants encountered the crowd at what was an

11   outdoor media enclosure.  And the Court has seen what

12   happened and the results.

13        THE COURT:  Okay.  And the GoPro video that you

14   submitted, that was for the purpose of establishing her

15   presence at that media enclosure; is that right?

16        MR. ROCHLIN:  In the GoPro video, Your Honor,

17   that was for the purpose of establishing what happened

18   at the enclosure.  Ms. Ryan's co-defendant does appear

19   briefly in that video at about five minutes and 30 seconds

20   in, give or take a few seconds, and the photograph shows

21   that Ms. Ryan was there observing as well, in a photograph

22   with her co-defendant, as somebody appears to be actively

23   taking it looks like a pole or a flag and jamming it into

24   equipment.  So, yes, that is one of the events that occurred

25   after Ms. Ryan left the interior of the Capitol.

1    Other recordings that the United States feels it

2    can place after Ms. Ryan's exit from the Capitol include a

3    recording of a crowd that -- you know, notwithstanding the

4    fact that people have come out, there is a crowd that is

5    trying to go in.  And Ms. Ryan is recording that, and she is

6    shouting, "We are pushing our way in."  So even after her

7    own exit she seems to be encouraging, promoting, endorsing,

8    if you will, the effort of the crowd to push its way in, to

9    force its way in.

10    She, at one point, as she herself has explained to

11    the Court, is standing on the steps.  She is preaching to

12    the crowd.  The United States, by referring to this, does

13    not in any way mean to criticize Ms. Ryan for preaching to

14    the crowd that was assembled, but she allows herself to be

15    interrupted by someone who approaches her to report that a

16    window is being broken, and she should film it, which she

17    immediately proceeds to try and do.

18    She goes over to the window.  She is shouting

19    slogans.  She refers to the -- she refers to Senator Mitch

20    McConnell in a disparaging way.  She approaches the window.

21    She films it.  By the time she gets to this particular

22    window the people who have damaged it have already finished

23    that particular job, and I can't tell the Court with any

24    accuracy that they're even in the video, but it appears to

25    be the same window that the defendant photographs and Tweets

1    with a caption saying that they're coming for the news media

2    next.

3              THE COURT:  You say in your memo that she joined

4    in the "Hang Mike Pence" chant.  I looked for that in the

5    video and did not see it.  Is that in the video, or no?

6              MR. ROCHLIN:  My recollection is that it is in the

7    video, Your Honor, and my notes reflect that as well, and I

8    am -- I strive for accuracy, Your Honor.  I am not going to

9    rule out the fact that I could have misinterpreted or

10   misheard.  I think the video should speak for itself.

11             I do believe it is still potent evidence, the fact

12   that the defendant, who to this day says she has no

13   knowledge of violence, that she didn't witness any

14   violence -- which seems to be contradicted by the evidence

15   the government has presented -- is, again, present for a

16   chant where the crowd is shouting "Hang Mike Pence."  That

17   has relevance even if the defendant did not join in with

18   that.  But she joined in with plenty of other chants that

19   I'll refrain from repeating at this moment unless the Court

20   requests.

21             The other kind of stand-out video for the United

22   States is when the defendant acknowledges hearing -- I am

23   not assuming it's the same window as the one in the Tweet or

24   the one she was asked to film, but she announces that she

25   hears windows being broken.  And this is at the same time or

1    in the same recording, at least, where knowledge that

2    somebody inside the Capitol, a woman, has been shot with

3    what the defendant refers to as a real bullet, and in that

4    recording you can hear members of the crowd in the

5    background referring to the fact that someone has been shot.

6    The defendant makes note of that in her self-recording, and

7    then she comments on the sound that windows are being

8    broken.

9           She says this is the start of a war, returning to

10   a theme that she has been presenting since approximately

11   7:00 a.m. that morning; that what is happening on January

12   6th, even before anybody has gone to the Capitol, even

13   before there's a mob at the Capitol, that this day is a

14   prelude to war, to paraphrase some of her phrasing.  And she

15   comments as well in the aftermath of the reference to the

16   beginning of a war and the breaking of windows essentially

17   "What do you expect to happen?" and "The military isn't

18   going to come," and "Really, we could go in there."

19           And all of this is being not simply said in

20   apparent endorsement and approval of the events taking

21   place.  These things are being recorded and broadcast.  And

22   many of the recordings the United States has presented in

23   this case I can say with almost near certainty were

24   broadcast on social media because that's how the United

25   States found them.  We recovered them from social media.

1    Other recordings were in her phone.

2           But the purpose was clearly to broadcast, to

3    disseminate.  And I don't think this was meant to occur in

4    an objective way.  I don't think this was meant to be

5    presented as criticism of what was happening.  This is

6    someone who said we are going to storm the Capitol, and that

7    is why we came here.  This is someone who was advocating to

8    stop the steal.  This is someone who was encouraging others

9    to get on their planes.  This is someone who said in one

10   recording it's not just about me, it's about all of you, and

11   it wouldn't be just me confronting tear gas, breaking

12   windows.

13          Again, I'm not quoting exactly word for word, but

14   that's the sense of what she says.

15          And this is someone who isn't your Average Joe,

16   Your Honor.  This is someone with a significant social media

17   following.  This is someone who can take a picture of a

18   broken window, and it will get, rounding upwards a little

19   bit, a quarter of a million likes.

20          So the United States, I would suggest, is

21   rightfully concerned not that this defendant engaged in

22   violence hands on, but that through approving it, through

23   broadcasting it, through, in effect, inciting it, there is a

24   risk in the future, if there are similar setbacks for her

25   political objectives or the objectives of those she joins,

1    that there could be additional violence at some other state

2    house or in this city or wherever some other mob decides it

3    is appropriate to react in that fashion.

4            This is something that concerns the United States,

5    especially when the defendant appears to be in a state of

6    denial about her own conduct and has said so frequently;

7    that she is a martyr; that she deserves a medal; that what

8    she did was noble; that what she did was an act of duty.

9            THE COURT:  The Justice Department has the

10    difficult task of trying to distinguish between the hundreds

11    of defendants in these cases -- I think the latest count is

12    upwards of 700 -- both in its charging decisions and in its

13    sentencing recommendations.  I know that it is not a

14    science, but give me a sense as to why the department has

15    come up with the recommendation it has made in this

16    particular case.

17            Why not probation?  Why not three months?  Why not

18    six months?  Why the two-month recommendation, to the extent

19    that you can flesh that out?

20            MR. ROCHLIN:  It is an art, Your Honor, but let me

21    try and give you a sense of some of the factors the United

22    States has considered in assessing this defendant.

23            First of all is the fact that in effect she was

24    drawn to the riot, unlike many others, all right.  She can't

25    say that she walked from the rally directly to the Capitol

1    the Capitol for the two minutes, but that's not the shortest

2    amount of time of any defendant who has been charged for

3    spending time inside of the Capitol.

4              I would also point out that when I looked at other

5    defendants who have been charged --

6              THE COURT:  Counsel, I think we covered the

7    landscape in terms of the offense so we don't need to

8    replow.

9              MR. ROCHLIN:  Very well, Your Honor.  I won't beat

10   a dead horse then, but there are reasons to distinguish this

11   defendant, and I thank the Court for its consideration.

12             THE COURT:  Very well.

13             Ms. Ryan, anything you want to tell me before I

14   impose your sentence?  Why don't you both come to the

15   microphone.

16             THE DEFENDANT:  I just want to say that I'm very

17   sorry.  I mean, there's really not words to describe.  I was

18   foolish, and I made a mistake, and I learned from that

19   mistake, more like a thousand lessons, and I was just -- I

20   made a mistake, and I'm sorry, and you will never see me in

21   this light again.  I promise.  And it's just not anything

22   that remotely resembles who I am, and I'm sorry.

23             THE COURT:  All right.  I am not the kind of judge

24   that lectures defendants, and certainly not grown women like

25   yourself, but I do try to, in all cases, explain the reasons

1   why I have come to the sentence that I have, and I will do

2   so in this case and, in the course of doing that, try to

3   address as many of the arguments that Mr. Womack has made

4   and the points that the government has made in its memo.

5          And the starting point is what we call the nature

6   and seriousness of the offense.  It's what you did, right?

7   And there is a tendency in these January 6th cases, to lump

8   everybody together.  Those people.  Those rioters.  These

9   people.  On both sides of the aisle.

10         But, you know, there are over 700 of these

11  defendants now, and each one of them is different.  Each

12  defendant's role is different, and your particular

13  involvement has been discussed at length in the memos and

14  here in court today, and it is true that you played a lesser

15  role in the criminal conduct that took place than many

16  others did.  You were not an organizer.  You were not a

17  planner.  You did not break any windows or knock down any

18  doors or hurt anybody or steal anything, nor did you bring

19  any guns or knives.  And we see folks all over the map who

20  have done all of those things.

21         And you didn't make your way onto the Senate floor

22  like many others did.  And as your counsel has emphasized,

23  you were only in the building for about two minutes.

24         I think there's a dispute as to why you left.  I

25  think it is fair to assume that you may have left not

 1    because you had second thoughts but because you didn't want

 2    to experience the tear gas that you obviously noticed when

 3    you hit the building.

 4         But in any event, all those factors explain why

 5    you are here on a single misdemeanor count rather than the

 6    felony offenses that many others are facing, but that does

 7    not mean that you don't have any culpability in what

 8    happened that day.

 9         Obviously you pled guilty to the count that you

10    did, but beyond that, I think the government is correct by

11    emphasizing that you knowingly took part in something that

12    was much more serious.  And I don't doubt that, you know,

13    you probably didn't appreciate the full seriousness of what

14    was going on that day, but it was much more dangerous than

15    just your stepping foot into the Capitol for two minutes.

16         You joined a large group of people who were intent

17    on, in your own words beforehand, storming the Capitol in

18    order to prevent the Senate and the Vice President from

19    performing their constitutional duty to certify the election

20    results.  And when you chose to leave your hotel room and

21    march down to the Capitol, I think it's clear that you knew

22    that this was no ordinary peaceful protest.  You knew that

23    because you were watching Fox News in real time in your

24    hotel room and commented that they're climbing the walls of

25    the Capitol.  You knew it at 12:28 when you got a Tweet

1    saying, quote, Trump supporters are now actively destroying

2    and trying to occupy the Capitol.  You claim you don't

3    remember reading that Tweet, but the metadata presented by

4    the government indicates that it was read.  You knew it when

5    you walked out of your hotel room and said we're going to

6    war, and we're going to be breaking windows.

7                THE DEFENDANT:  I did not say that.

8                THE COURT:  Now that may be hyperbolic --

9                THE DEFENDANT:  I didn't say that.

10                THE COURT:  -- but it's on the video.  And you

11    knew it when you got to the Capitol when the riot was still

12    going on.  You passed by a broken window.  You heard the

13    alarms going off, and you smelled tear gas; so I don't think

14    you could have missed the fact that this was no peaceful

15    protest and that there was violence going on around you.

16                Now, I know you didn't participate in it --

17                THE DEFENDANT:  Right.

18                THE COURT:  -- but you did celebrate it, and you

19    were a cheerleader.  You cheered it on.  You posted a Tweet

20    next to the broken window after you left and saying, you

21    know, to the media, "We're coming after you next."  And you

22    stood by and Tweeted while folks destroyed the media

23    equipment and the encampment after you left.  All right?

24                You didn't have to be there.  You could have gone

25    home.

1          THE DEFENDANT:  It was already done.

2          THE COURT:  You could have gone home.

3          THE DEFENDANT:  Yes.

4          THE COURT:  Once that tear gas hit you and you

5     realized what was going on and this was not the place to be,

6     you could have gone home; but you didn't, okay?

7          And in any case, even if your own conduct was

8     peaceful, as a number of my colleagues have noted, you still

9     bear at least some degree of responsibility for the tragedy

10    of that day.

11         I believe you.  You didn't see any police.  You

12    walked right by a police officer.  He didn't try to stop

13    you.  He didn't say, "Don't go in."  I get that.

14         But one reason for that is because they were

15    outnumbered.  They were overwhelmed, all right?  And it was

16    the presence of the group.  There is strength in numbers.

17    It was the presence of the mob that caused law enforcement

18    to be overwhelmed and not to be in a position to stop people

19    from going in.  And that makes every person who decided to

20    go in that day -- even if it was somewhat after the fact

21    like you.  You weren't the first person in.  I get that.

22    But your very presence, your very numbers, mean that you

23    have at least some responsibility for what happened that

24    day.

25         Let me make clear, we've talked about the First

1    Amendment.  I will reiterate what the government has said.

2    No one is being prosecuted for coming to Washington, D.C.,

3    that day.  No one is being prosecuted for the belief that

4    the election was stolen.  If you had the good sense not to

5    leave your hotel room or even to go down there and to stop

6    one foot before you went in, you wouldn't be here today,

7    okay?  The only reason that you are here is because you

8    decided to join in and to go into the building.

9         And not to belabor the point, but I think it's an

10   important one.  We get protesters all the time in

11   Washington, D.C.  I see them from my window virtually every

12   week.  Sometimes I don't even know what they're protesting.

13   And that's great.  That's part of our democracy.  We

14   encourage it.

15        But when folks get unruly, when they break stuff,

16   when they hurt people, the police make arrests, and

17   sometimes those people get charged.

18        A few years ago the U.S. Attorney's Office here in

19   D.C. charged five protesters with disrupting a Supreme Court

20   argument.  They didn't like the Supreme Court's decision in

21   *Citizens United*.  Do you know what *Citizens United* is?

22        THE DEFENDANT:  (No verbal response)

23        THE COURT:  It's a Supreme Court decision that

24   permitted or said that corporations and other organizations

25   have a First Amendment right to contribute unlimited sums of

1    money in support of political candidates, okay?  And a lot

2    of people didn't like that.

3              THE DEFENDANT:  Okay.

4              THE COURT:  And most of those folks were on the

5    left.  And five folks came, and they stood up and disrupted

6    a Supreme Court argument.  Like you, they didn't hurt

7    anybody.  They didn't break anything.  But they were charged

8    with federal misdemeanors, just like you, all right?

9              So you're not being singled out for your political

10   views or anything like that.  And I told them the exact same

11   thing.  It's not about the political views that you

12   expressed, but it's how and where you decided to express

13   them.  Okay?

14             The next thing I have to consider is you, all

15   right, your particular characteristics.  I've read all of

16   the materials.  You were dealt some bad cards as a kid, and

17   I don't feel the need -- and in your adult life as well, and

18   I feel no need to go into that on the record.  But

19   especially given where you started from, you've obviously

20   had to work very hard, and you've had to hustle for the

21   professional success that you have achieved, both in your

22   real estate business and in your various social media

23   ventures.

24             THE DEFENDANT:  Yes.

25             THE COURT:  And you should be proud of that, and

1    you can take credit for that.

2              On the other side of the coin, your statements and

3    your media appearances after January 6th, I think,

4    demonstrate a certain lack of accountability for your

5    actions, okay?  You've played down your role in the events.

6    You've been very up front that you feel no sense of shame or

7    guilt.  You've blamed the FBI.  You've called this a witch

8    hunt.  You've suggested that Antifa was somehow involved

9    despite no evidence whatsoever of that, and perhaps most

10   famously, in words that I'm sure that you regret, you

11   predicted that you wouldn't go to jail because you have

12   blonde hair and white skin.

13             THE DEFENDANT:  I was taking up for myself.

14   Someone -- I was being attacked, and I was answering them,

15   and they were saying you're a blonde insurrectionist.  So I

16   was taking up for myself.  I didn't just Tweet that as a --

17   but of course that was -- I shouldn't have -- I just

18   shouldn't Tweet.

19             I mean, I was really taking up for myself, and I

20   didn't do a great job at that.

21             THE COURT:  Okay.  And, again, you're free to say

22   all of those things.

23             THE DEFENDANT:  Well --

24             THE COURT:  But by making those appearances and

25   going on social media, you know, the folks who respond have

1    a First Amendment right to respond even if they do so in

2    completely inappropriate --

3              THE DEFENDANT:  They were doing it already.

4              THE COURT:  -- ways, okay?  But you put yourself

5    out there, all right, and they responded.  And if they

6    responded by vandalizing your real estate signs or doxing

7    you or, you know, threatening you, then that is not

8    protected by the First Amendment.  But certainly their

9    Tweets are, and, you know, you get yourself into that briar

10   patch, and you've got to live with it, right?

11             THE DEFENDANT:  Yes.

12             THE COURT:  And as Mr. Womack acknowledged, you

13   know, while you have a right to go on ABC News and say all

14   those things and Tweet, you know, I can't disregard that.  I

15   can assess whether you've shown genuine remorse, whether

16   you've truly accepted responsibility beyond just signing

17   that plea document --

18             THE DEFENDANT:  Right.

19             THE COURT:  -- and whether you have shown, you

20   know, respect for the law and respect for this Court; and

21   it's not about me personally, but about respect for the

22   process.  And your actions since January 6th, you know,

23   makes me doubt some of those things.

24             But that brings me to the need for general

25   deterrence, right?  And you noted somewhere I read that for

2    January 6th incident, right?  Now, I think you may have --
3    you know, that may be particular to your case, respectfully,
4    so public in your statements about it, but for whatever the
5    reason your case has generated a fair amount of public
6    interest, and as a result, people will be interested to know
7    what sentence you get, and that sentence will tell them
8    something about how the courts and about how our country
9    responded to what happened on January 6th.  And I think that
10    the sentence should tell them that we take it seriously;
11    that it was an assault on our democracy; that it cost the
12    lives of five people; that it had lasting and potentially
13    dangerous effects on our government institutions; and that
14    it should never happen again.

15            That does not mean that everyone who participated
16    should be charged with a felony.  That does not mean that,
17    you know, misdemeanant defendants should not get probation
18    in appropriate cases, and I suspect that many of them will,
19    and many of them have thus far.

20            The Justice Department has a very difficult role
21    of balancing all of the competing factors, including the
22    need to just physically process the 700 and growing number
23    of defendants that have been charged thus far.  And they
24    have to do that while at the same time reaching
25    individualized charging decisions and sentencing

1      better or for worse you've become one of the faces of the

1    recommendations.

2         Folks are going to second-guess those decisions

3    from both sides.  That's only natural.  But in this case, at

4    least, I believe that the Department has exercised that

5    responsibility appropriately and has struck the right

6    balance in the sentencing recommendation that it has

7    provided me.

8         So with that, pursuant to the Sentencing Reform

9    Act of 1984 and in consideration of the provisions of 18 USC

10   Section 3553 as well as the advisory sentencing guidelines

11   or at least the factors set forth, it is the judgment of the

12   Court, that you, Jennifer Leigh Ryan, are hereby committed

13   to the custody of the Bureau of Prisons for a term of 60

14   days imprisonment on Count 4.  In addition, you are ordered

15   to pay a special assessment of $10 in accordance with 18 USC

16   3013.  The Court will also impose a fine of $1,000 to be

17   payable within 90 days.  You are also ordered to make

18   restitution in the amount of $500 to the Architect of the

19   Capitol.  The Court waives any interest or penalties that

20   may accrue on that balance.

21        Fine and restitution payments shall be made to the

22   Clerk of the Court for the United States District Court for

23   the District of Columbia for disbursements to the following

24   victim:  The Architect of the Capitol.  And the address will

25   be in the judgment and committal order.

1      Financial obligations are immediately payable to

2  the Clerk of the Court of the United States District Court.

3  Within 30 days of any change of address you shall notify the

4  Clerk of the Court of the change until such time as the

5  financial obligation is paid in full.

6      You have a right to appeal the sentence imposed by

7  the Court if the period of imprisonment is longer than the

8  statutory maximum.  If you choose to appeal, you must file

9  any appeal within 14 days after the Court enters judgment.

10     You also have the right to challenge the

11  conviction entered or the sentence imposed if new and

12  currently unavailable information becomes available to you

13  or on a claim that you received ineffective assistance of

14  counsel in entering a plea of guilty to the offense of

15  conviction or in connection with this sentencing.  If you

16  are unable to afford the cost of an appeal, you may request

17  permission from the Court to file an appeal without cost to

18  you.

19     The Court will direct -- no issue with self-

20  reporting, Ms. Rochlin?

21     MR. ROCHLIN:  No, Your Honor.

22     THE COURT:  Okay.  The Court will order the

23  defendant to report on a date after January 3rd.

24     Any other objections to the sentence?

25     MR. ROCHLIN:  Not from the United States, Your

1  Honor.

2          THE COURT:  Mr. Womack?

3          MR. WOMACK:  No, Your Honor.

4          THE COURT:  Okay.  Placement recommendation?

5  Recommend someplace near the Northern District of Texas?

6          MR. WOMACK:  Yes, Your Honor.  The only facility I

7  believe is in Bryan, Texas, in the southern district.  It's

8  not too far from Dallas.

9          THE COURT:  Ms. Ryan, we will recommend a

10  placement near your home in Dallas.  The Court's

11  recommendation is not binding.  The Bureau of Prisons will

12  determine where you will be placed, and you should await

13  further instructions from them, all right?

14          There is no probation or supervised release in

15  this case so I will not see you again.

16          THE DEFENDANT:  Okay.

17          THE COURT:  Unless you decide to come back to D.C.

18  for some reason.

19          THE DEFENDANT:  Never.

20          THE COURT:  I know that in your letter you said

21  that you plan to stay away from politics and stick to, as

22  you say, make-up and macaroni and cheese.

23          THE DEFENDANT:  Yes.  I think that's a good idea.

24          THE COURT:  That might be a wise idea, although

25  I -- you know, I encourage everyone to remain, you know,

```
 1   active in political life.  I would simply suggest -- and you
 2   don't have to take my suggestion -- that if you do so
 3   perhaps be a little more discriminating and far-ranging in
 4   your selection of news and information sources, okay?
 5              THE DEFENDANT:  Okay.
 6              THE COURT:  All right.  Good luck to you, ma'am.
 7              THE DEFENDANT:  Thank you.
 8              THE COURTROOM DEPUTY:  Your Honor, the remaining
 9   charges --
10              THE COURT:  The government should dismiss the
11   other charges in the information.
12              MR. ROCHLIN:  Yes, Your Honor.  Forgive me for
13   being a little slow on the uptake, but the United States so
14   moves.
15              THE COURT:  All right.  So ordered.
16              Anything else, Counsel?
17              MR. WOMACK:  No, Your Honor.
18              THE COURT:  Okay.  Good luck, Ms. Ryan.
19              THE DEFENDANT:  Thank you.
20                   (Whereupon the hearing was
21                    concluded at 11:22 a.m.)
22
23
24
25
```

1        **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3                I, LISA A. MOREIRA, RDR, CRR, do hereby

4    certify that the above and foregoing constitutes a true and

5    accurate transcript of my stenographic notes and is a full,

6    true and complete transcript of the proceedings to the best

7    of my ability.

8        Dated this 10th day of November, 2021.

9

10                              /s/Lisa A. Moreira, RDR, CRR
                                Official Court Reporter
11                              United States Courthouse
                                Room 6718
12                              333 Constitution Avenue, NW
                                Washington, DC 20001
13

14

15

16

17

18

19

20

21

22

23

24

25

*Exhibit "C"*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CASE NO. 1:21-CF-00050 (CRC) |
| | § | |
| JENNIFER LEIGH RYAN | § | |

## DEFENDANT'S SENTENCE MEMORANDUM

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COMES NOW Defendant, through Defendant's Counsel, and files this sentencing memorandum.

I.

## Ms. Ryan's Position Regarding Government Comments

Ms. Ryan objects to the position taken by the United States Attorney in this case and will address these objections and respond with her position on sentencing in this case.

As correctly cited in the Government's sentencing memorandum, Ms. Ryan entered a plea to Count 4 of the Second Superseding Information, which alleged a violation of Title 40, U.S. Code, Section 5104(e)(2)(G). This alleged that she wrongfully paraded, demonstrated and/or picketed in the Capitol, and nothing more.

Ms. Ryan was the first of the defendants named in the Complaint to come forward and enter a guilty plea. Further, when she first encountered law enforcement officers, on or before January 15, 2021, Ms. Ryan relinquished to the FBI her cellular telephone and various computers, laptops and other pieces of electronic equipment via which she operated in social media. She provided the agents with the passwords necessary for them review the information contained in the devices. Although the Government promised to return the equipment promptly, her property

was not returned until late-October, more than ten months after they were seized and examined.

Ms. Ryan retained this Defense Counsel on February 3, 2021, after many of the social media comments and television interviews that so offended the Government prosecutor.

Immediately after being retained, and while awaiting admission to the Bar of the District of Columbia, this Defense Counsel contacted Assistant U.S. Attorney Frances Blake, who originally had this case. We discussed the evidence and This Counsel offered to have Ms. Ryan meet with the AUSA and her agents in order to proffer what she knew about the case. We were actively offering to enter into a plea agreement with the Government, but the AUSA said she was having problems getting a response from her superiors in the Washington, DC, office. It was not until late-July that a plea agreement was finally drafted and relayed to the Defense. The case was then set for re-arraignment on the earliest available date.

As Ms. Ryan mentions in her attached written statement to This Honorable Court, she cooperated or attempted to cooperate with the Government in every conceivable way since being charged in this case.

The Defense very respectfully suggests this is important information for Your Honor to consider.

With regards to Ms. Ryan's actions on January 6, 2021, there is no evidence of Ms. Ryan proceeding more than about 10 feet beyond the doorway at which she entered the Capitol. In the still photograph included in the Government's sentencing memorandum, it shows Ms. Ryan inside the entrance to the Capitol, and one can count the number of persons standing behind her and inside the Capitol. Ms. Ryan is approximately the fourth person in line from the threshold of the entrance, and all persons behind her are standing within only a few inches of the person in front and behind each other. It would appear Ms. Ryan is approximately 6 feet from the door. And in

2

the video from which the still photograph was taken, one would see Ms. Ryan and a Capitol Police Officer greet each other amicably. There is no evidence of any Officer telling Ms. Ryan not to enter the Capitol or directing her to leave. And, as the Government concedes, she remained inside the Capitol only about two minutes. Ms. Ryan's trespass into this public building was for only a very short time and she was never more than 10 feet from the door. Ms. Ryan did not approach the House or Senate chambers, or even get far enough inside to view the magnificent statues and other artwork in the various wings and halls of the building. She merely walked inside the door, stood peacefully, chanted unoffensively along with the crowd, then exited as she had entered. Her actions were part of the protest of the day, and she has admitted that she knew it was wrong to parade or demonstrate inside the Capitol that day. It is this act, alone, that she has been convicted of and for which she should be sentenced.

However, from reading the Government's twenty-seven page memorandum to This Honorable Court, it is worth noting that the great bulk of their focus is on comments Ms. Ryan made before and after the trespass inside the Capitol. And every comment made by Ms. Ryan is the sort that is protected by the First Amendment. Ms. Ryan did not damage any property and did not incite violence. Her comments on social media reflected her belief that a wrong had been committed in the way the Presidential election had been conducted, that there were significant acts of election fraud, and that the Presidency had, in effect, been stolen. As one may assume, there are many – perhaps millions – American voters who feel as Ms. Ryan felt that day. Her comments aren't illegal, and she was not charged with anything regarding her speech surrounding this protest. She did not witness violence before going to the Capitol that afternoon, was not a witness to violence, and did not take part in any violence at any time.

3

II.

## The U.S. Probation Officer's Recommended Sentence

Ms. Ryan very respectfully requests that This Honorable Court sustain our objections and sentence Defendant to probation, as recommended by the U. S. Probation Officer in this case.

Ms. Ryan's former offenses occurred more than a decade ago, and she never repeated those offenses. As noted in the Probation Officer's Sentencing Recommendation, rehabilitation of Ms. Ryan does not appear to be a particular concern, she does not pose a danger to the community, and is in full compliance with the terms of her release since this case began.

And, as noted in the second paragraph of the Probation Officer's recommendations, Ms. Ryan's culpability is minimal in contrast with the true rioters.

As stated in Title 18, U.S. C., Section 3553(a), the sentence to be imposed should be no greater than required to satisfy the sentencing factors. We believe a sentence to probation, along with the agreed upon amount of restitution, satisfies the lawful and proper sentencing objectives within our system of justice.

III.

## Conclusion

WHEREFORE, premises considered, Defendant very respectfully requests that This Honorable Court sentence her to probation and restitution in the amount of $500.00.

Very respectfully,

*/S/ Guy L. Womack*
Guy L. Womack
Counsel for Defendant
Texas Bar No. 00788928
609 Heights Blvd.
Houston, Texas   77007
Tel: (713) 224-8815
Fax: (713) 224-8812

4

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing was served upon the Probation Officer and Government Counsel by email on this 1st day of November, 2021.

*/S/ Guy L. Womack*
Guy L. Womack

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Jennifer L. Ryan

## DEFENDANTS
United States Department of Justice and Karen E. Rochlin

**(b)** County of Residence of First Listed Plaintiff   **Dallas**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   **Miami Dade County**
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

RECEIVED

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Pro Se

FEB 1 0 2025

Attorneys *(If Known)*

3 - 25 CV 0 3 2 5 - X

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

[x] 1 U.S. Government Plaintiff

[ ] 3 Federal Question CLERK, U.S. DISTRICT COURT *(U.S. Government Not a Party)* RICT OF TEXAS

[ ] 2 U.S. Government Defendant

[ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [x] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC 881 | 422 Appeal 28 USC 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury - | 690 Other | 423 Withdrawal | 376 Qui Tam (31 USC |
| 130 Miller Act | 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| 140 Negotiable Instrument | Liability | 367 Health Care/ | | **INTELLECTUAL** | 400 State Reapportionment |
| 150 Recovery of Overpayment | 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | 820 Copyrights | 430 Banks and Banking |
| 151 Medicare Act | 330 Federal Employers' | Product Liability | | 830 Patent | 450 Commerce |
| 152 Recovery of Defaulted | Liability | 368 Asbestos Personal | | 835 Patent - Abbreviated | 460 Deportation |
| Student Loans | 340 Marine | Injury Product | | New Drug Application | 470 Racketeer Influenced and |
| (Excludes Veterans) | 345 Marine Product | Liability | | 840 Trademark | Corrupt Organizations |
| 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | 880 Defend Trade Secrets | 480 Consumer Credit |
| of Veteran's Benefits | 350 Motor Vehicle | 370 Other Fraud | 710 Fair Labor Standards | Act of 2016 | (15 USC 1681 or 1692) |
| 160 Stockholders' Suits | 355 Motor Vehicle | 371 Truth in Lending | Act | | 485 Telephone Consumer |
| 190 Other Contract | Product Liability | 380 Other Personal | 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| 195 Contract Product Liability | 360 Other Personal | Property Damage | Relations | 861 HIA (1395ff) | 490 Cable/Sat TV |
| 196 Franchise | Injury | 385 Property Damage | 740 Railway Labor Act | 862 Black Lung (923) | 850 Securities/Commodities/ |
| | 362 Personal Injury - | Product Liability | 751 Family and Medical | 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | | Leave Act | 864 SSID Title XVI | 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 790 Other Labor Litigation | 865 RSI (405(g)) | 891 Agricultural Acts |
| 210 Land Condemnation | [x] 440 Other Civil Rights | **Habeas Corpus:** | 791 Employee Retirement | | 893 Environmental Matters |
| 220 Foreclosure | 441 Voting | 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | 895 Freedom of Information |
| 230 Rent Lease & Ejectment | 442 Employment | 510 Motions to Vacate | | 870 Taxes (U.S. Plaintiff | Act |
| 240 Torts to Land | 443 Housing/ | Sentence | | or Defendant) | 896 Arbitration |
| 245 Tort Product Liability | Accommodations | 530 General | | 871 IRS—Third Party | 899 Administrative Procedure |
| 290 All Other Real Property | 445 Amer. w/Disabilities - | 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment | **Other:** | 462 Naturalization Application | | Agency Decision |
| | 446 Amer. w/Disabilities - | 540 Mandamus & Other | 465 Other Immigration | | 950 Constitutionality of |
| | Other | 550 Civil Rights | Actions | | State Statutes |
| | 448 Education | 555 Prison Condition | | | |
| | | 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

[x] 1 Original Proceeding

[ ] 2 Removed from State Court

[ ] 3 Remanded from Appellate Court

[ ] 4 Reinstated or Reopened

[ ] 5 Transferred from Another District *(specify)*

[ ] 6 Multidistrict Litigation - Transfer

[ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1346(b)(1) – Federal Tort Claims Act (FTCA)

Brief description of cause:
Malicious Prosecution, Emotional Distress, and Abuse of Process

## VII. REQUESTED IN COMPLAINT:
[ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   [x] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE   02/10/2025   2/10/2025

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #   _____   AMOUNT   _____   APPLYING IFP   _____   JUDGE   _____   MAG. JUDGE   _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related cases, if any. If there are related cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.