## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA



EXHIBIT # **C**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No. 1:21-cr-00050 (CRC)** |
| v. | : | |
| | : | |
| **JENNIFER LEIGH RYAN,** | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Jennifer Leigh Ryan to a 60-day term of incarceration and $500 in restitution.

### I.      Introduction

For more than a decade, Defendant Jennifer Leigh Ryan ("the defendant") has promoted her personal brand, touting her success as a real estate broker, self-help coach, and media personality. As a self-described "influencer," the defendant broadcasts over various platforms, including social media, Youtube, and radio, garnering thousands of followers and millions of views. *See* PreSentence Investigation Report ("PSR") at ¶¶ 768, 79. On January 6, 2021, the defendant enthusiastically participated in the attack on the United States Capitol while sharing the experience with her followers. Throughout the day, she posted and live-streamed her activity, publicly cheerleading a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than a million dollars' worth of property damage.

1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00050 (CRC)** |
| **v.** | : | |
| | : | |
| **JENNIFER LEIGH RYAN,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Jennifer Leigh Ryan to a 60-day term of incarceration and $500 in restitution.

**I.     Introduction**

For more than a decade, Defendant Jennifer Leigh Ryan ("the defendant") has promoted her personal brand, touting her success as a real estate broker, self-help coach, and media personality. As a self-described "influencer," the defendant broadcasts over various platforms, including social media, Youtube, and radio, garnering thousands of followers and millions of views. *See* PreSentence Investigation Report ("PSR") at ¶¶ 768, 79. On January 6, 2021, the defendant enthusiastically participated in the attack on the United States Capitol while sharing the experience with her followers. Throughout the day, she posted and live-streamed her activity, publicly cheerleading a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than a million dollars' worth of property damage.

The defendant pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating or Picketing in a Capitol Building.  gAs explained herein, a custodial sentence is appropriate in this case for numerous reasons.

First, the defendant was aware that January 6 could be and did become violent.  Hours before any mob formed at the Capitol, the defendant broadcast repeated statements that the day was a "prelude" to "war."  Before deciding to join others at the Capitol, the defendant received and read a forwarded tweet reporting that rioters had breached barriers, caused destruction, and overwhelmed police.  Minutes later, from her hotel, she streamed on Facebook Live that "we're gonna go down and storm the Capitol; they're down there right now and that's why we came [.]" As she left the hotel, she streamed, "I'm kinda freakin' out.  Because I'm going to war."

Second, as she arrived at the Capitol, the defendant continued to promote violence.  She posted a recording of herself stating that "we're all gonna be up here, we're gonna be breakin' those windows, we're gonna be havin' to deal with the tear bombs" and proclaiming, as she approached the East Rotunda door, "Life or death, it doesn't matter, here we go."  After entering the Capitol, the defendant stood inside the Rotunda lobby while another rioter shouted to others to "go to [Speaker of the House Nancy] Pelosi's office and destroy it," after which the defendant joined shouts to "Fight for Trump" before chemical irritants caused her to retreat from the building.

Third, the defendant's participation in the riot included more than a brief entry into and exit from the Capitol Building itself.  Although she left the Capitol interior after only a few minutes, the defendant recorded herself near the building's exterior between 3:37 and 4:22 p.m. as she encouraged others to enter, shouted "we're pushing our way in," chanted "Hang Mike Pence," and observed that "really, we could go in there" and "the military's not gonna come."

Fourth, the defendant promoted additional violence beyond the Capitol, tweeting a photograph of a broken window captioned with a threat that "if the news doesn't stop lying about us we're going to come after their studios next . . ." (ellipsis in original). Minutes later, the defendant posted another tweet about the "cool moment" when a crowd that included her codefendant damaged press equipment at a media enclosure on the Capitol grounds.

Fifth, after the riot, the defendant publicly and repeatedly communicated a lack of remorse. In multiple television interviews and in subsequent social media postings that include a smiling self-portrait beside the broken Capitol window described above, and a tweet that January 6 was the "best day of my life." In a personal message from January 12, 2021 that was recovered from her cellular phone, she claimed "I deserve a medal for what I did."[1] In an interview with Spectrum News recorded on January 8, 2021 and aired the following week, the defendant stated she "did not regret" her actions at the Capitol.[2] In an interview recorded on or about January 13, 2021 with Cynthia McFadden of NBC News, the defendant explained that she felt "like a martyr" and had "no guilt in my heart." In an interview with Fox News, the defendant described her presence on January 6 as "something noble." At the end of a tweet posted on March 26, 2021, the defendant stated "I did nothing wrong."

Sixth, the defendant actively and widely spread false information on social and traditional media that falsely downplayed or even denied the violence on January 6. The day after the riot,

---

[1] The defendant sent similar messages to various contacts. On January 8, 2021 at 10:29 a.m., she wrote to the group she accompanied to the Capitol, "We did nothing wrong." On January 9, 2021, two messages sent at 11:27 stated "I was standing up for my country" followed with "And I'm proud;" A message from January 10, 2021 at 7:24 p.m. to a reporter states "I hope you don't make me look bad but I really didn't do anything wrong . . .". On January 12, 2021 at 11:19 p.m., she wrote "And also I'm so proud of myself because I have balls of steel I'm f***ing where is the capital [sic];" and at 10:27 p.m., "I was so honest I said I'm storming the capital and I didn't hide it I made it public."

[2] *See* https://www.youtube.com/watch?v=wm7EjLmeWjA (at 5:10 minutes).

despite her earlier forecasts of "war", her references to storming the Capitol, her observation of rioters breaking windows, her participation in chants of "Hang Mike Pence," her excitement that "we are pushing our way in" to the Capitol, her knowledge of a crowd destroying media equipment, and her knowledge of at least one fatality, on January 7, 2021 the defendant tweeted that "We were not violent. . . . We were peaceful."  In the McFadden interview, the defendant claimed that "violence did not cross my mind."  In a series of messages replying to inquiries from a reporter, on January 7, 2021 the defendant wrote: "Assault?" "That's fake news."  "Riot?" "We were marching for freedom" and "It was so peaceful if you hadn't been there I have video of it all."  In her Spectrum News interview, the defendant obscured her own knowledge of violence, stating that she did not personally break any windows.

Seventh, the defendant also provided false information about the extent of her own conduct. In her Spectrum interview, she claimed, referring to the Capitol, "we didn't really want to go in there."[3]  In personal messages, she denied entering the Capitol at all.  To Spectrum, she claimed that she was "at the doorframe but no further."  In her pre-sentence interview with Probation, she falsely maintained that she did not even know there was a riot when she arrived at the Capitol. PSR ¶ 29.

Eighth, not only during the riot, but in its aftermath, the defendant sought to exploit her presence during the attack on the Capitol for profit.  In the midst of a riot meant to disrupt the certification of a presidential election, the defendant chose to promote her real estate business, boasting that "I will f***ing sell your house." In messages sent one week later, the defendant

---

[3] In contrast, the defendant recorded herself in her hotel room watching Fox news and exclaiming "they're climbing the walls of the Capitol" and "we're going to get them out of their chairs."

contemplated the business she needed to prepare for as a result of the publicity she received from joining the mob at the Capitol.

Ninth, the defendant's post-arrest conduct includes public statements made months after her arrest reflecting a belief that she is immune from punishment because of her appearance and social status, and a personal message that she will get off "Scott free."  The sense of impunity in these statements demonstrates a need for specific deterrence in this defendant's case, and reflects that she fails to appreciate the seriousness of her conduct or the charges against her.

 Despite the foregoing, the defendant's background may suggest some reasons for leniency. Her family history was troubled.  She has entered a guilty plea and accepted responsibility for at least her physical presence inside of the Capitol.  The defendant does have a criminal history, although it is dated and consists of misdemeanor convictions.  Nevertheless, the defendant's participation in a riot that actually succeeded in delaying the Congressional certification combined with her promotion and celebration of violence, her consistent and public lack of remorse, her dishonesty and sense of impunity, her mercenary exploitation of the riot, and her greater potential to incite future violence renders a custodial sentence both necessary and appropriate in this case.

## II.   Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 39 (Statement of Offense), at 1-5.  As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and d-estruction of that day.  *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety

of numbers.") (statement of Judge Chutkan).   With that backdrop we turn to the defendant's conduct and behavior on January 6.

*Jennifer Leigh Ryan's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, the defendant boarded a private plane chartered by a Facebook friend and traveled with her codefendants and others from her home in Texas to Washington, D.C. to attend the "Stop the Steal" rally.   At approximately 7:00 a.m. on the morning of January 6, the defendant streamed her walk to the rally on Facebook, commenting repeatedly that the rally was a "preclude" to "war."[4]  After attending the rally, the defendant and her group returned to their hotel rooms.

At approximately 2:20 p.m., the defendant recorded herself in her hotel room watching Fox News report the breach of the Capitol, exclaiming, "they're climbing the walls of the Capitol" and "we're going to go down there because we've had it."   At approximately 2:28 p.m., a member of the defendant's group forwarded a tweet describing "Trump supporters" who "breached all security barriers and are now actively destroying and occupying the Capitol building" and who were "fighting federal police who are overrun."   The image of this tweet was recovered from the

---

[4] At 1:20 minutes into the stream, (shortly after 7:00 a.m.), the defendant explains that she is there because "they want to steal the election."   At 4:19 minutes, she states that "protesting like this is a prelude to when we're gonna go to war; we're gonna pack up our bags and we're gonna have this fight."   At 5:22 minutes, she states "this is a prelude to the war that is about to happen and we are not messin' around there's a lot of us that are gonna be—there's more of us then there are of them, we're gonna go right onto that . . .we're gonna let them know that they better frickin' listen to the evidence today".   At 14:23 minutes, the defendant states that "if it comes down to war guess what I'm gonna be there I don't know what I'm gonna be doin' but I'm gonna be doin' something I guarantee . . . I'm gonna be fightin' on the front lines wherever it is—yup--because I'm that kinda girl and I think you should know it."   Again, at 20:17 minutes, the defendant states that "you guys, this is a prelude to going to war 'cause that's what's gonna have to happen if we do not win, we're gonna be the ones, we're gonna be the first ones sayin' no. Nonononononononono. You get up off your booties, get on your planes . . .".   The repeated characterization of the morning rally as a prelude to "war" foreshadows the violence at the Capitol that began hours later and forecloses any claims that the defendant intended to support only a peaceful protest.

defendant's cellular phone with metadata showing that the message was read. At approximately 2:33 p.m., the defendant tweeted "We are here!!!  We are taking it!!!  There is [sic] more of us then there are of them."  Minutes later, at approximately 1:41 p.m., the defendant streamed herself on Facebook from her hotel room stating: "We're going to go down and storm the Capitol.  They're down there right now and that's why we came and that's what we're gonna do so wish me luck."  At approximately 2:43 p.m., the defendant streamed herself on Facebook leaving her hotel room while saying "I'm kind of freaking out.  Because I'm going to war."

Approaching the Capitol, the defendant continued filming herself, explaining, "We're all gonna be up here we're gonna be breakin' those windows, we're gonna be havin' to deal with the tear bombs .  .  ."  She continued recording as she approached the entrance to the Capitol, proclaiming, "Life or death, it doesn't matter, here we go."  At 3:21 p.m., the defendant entered the Capitol through the East Rotunda door with codefendant Jason Lee Hyland, as she streamed herself moving past broken windows while alarms audibly sounded.  As the defendant entered, other exiting rioters streamed past her, commenting about tear gas in the air.



The defendant entered the Capitol, shouting "USA" and "in the name of Jesus." She asked Hyland about codefendant Katherine Staveley Schwab's location, and determined that Schwab was further ahead.  As she recorded her intrusion into the Capitol for Facebook Live, the defendant also found it appropriate to promote her real estate business, announcing "You guys, will you believe this?  I am not messing around.  When I come to sell your house, this is what I will do.  I will f***ing sell your house."[5]

The defendant declined to intrude as far as Schwab, anticipating that police would deploy tear gas and remarking, "I don't have any goggles."  Individuals next to her commented that "I don't think they're spraying people till they get to those wooden doors," indicating doors further ahead, and "if you push hard enough they'll budge."  The defendant responded, "Okay, let's just stand here."  Separately, a third party recorded the defendant standing and recording inside the Capitol while a rioter shouted for the crowd to "go to Pelosi's office and destroy it."[6]  The defendant then joined a chant to "Fight for Trump."  At 3:23 p.m., the defendant began to exit from the inside of the Capitol.

At approximately 3:30 p.m., the defendant recorded herself on Facebook preaching near the East Rotunda door when another rioter interjected, "they're breaking the window over here, film that s***." The defendant went to the window indicated; however, the damage had been

---

[5] In a later message on January 11, 2021, the defendant also boasted, "And I'm becoming famous from this.  And I'm getting lots and lots of business lined up for when all this blows over . . .".  On January 13, 2021, she sent an electronic message that "Now I have an NBC news request as well as Forbes I'm gonna be in every magazine in the world" followed by "Get ready for some business[.]"

[6] In a 43-minute interview with Cynthia McFadden for the Today Show, the defendant acknowledged hearing "instigators that were trying to start chants and stuff." https://www.today.com/video/jenna-ryan-describes-the-moment-she-entered-the-capitol-january-6-99615813711 (last checked Oct. 11, 2021).

completed. The damage to that window matches the window in a photograph the defendant later

tweeted, where she stands smiling and forming a "V" sign with her fingers.



At approximately 3:34 p.m., about eleven minutes after her exit from the Capitol's interior,

the defendant continued to record herself and a crowd trying to force its way through the Rotunda

door.  In this recording, the defendant exclaimed "we're pushing our way in, we will fight to the

death, I guarantee . . ." A minute or so later she remarked that she felt "a high like no other I have

ever experienced."   At approximately 3:36 p.m., the defendant joined chants of "Hang Mike

Pence."

At approximately 4:18 p.m., the defendant moved to another location at the Capitol.  At

4:22 p.m., the defendant recorded herself with Hyland and Schwab.  In the recording, after

exclaiming that she got "sprayed," the defendant repeats statements from other rioters that

someone got shot, and continues, "We are having a war.  This is the beginning of it.  I hate to tell

you.  I hate to be on the front lines.  That's the kind of people we're messin' with.  They shot a 17-

year old with a real bullet . . . . They're breaking the windows now.  I hear it.  That's what happens.

Whattaya gonna do, call the military?  Ya think the military's gonna come?  No.  The military's

not gonna come.  Really we can go in there [the Capitol]."

Before leaving the Capitol grounds, the defendant, Schwab, and Hyland arrived at a press

enclosure where the crowd attacked media equipment.  Schwab joined the crowd's assault.  A third

party's video posted on Youtube shows codefendant Schwab kicking media equipment and

throwing one piece of equipment on the ground.  That evening the defendant posted a description

on Twitter of "a cool moment" when "they just went to town on the AP equipment."  She also

tweeted a photo at 7:03 p.m. that night of the smashed equipment:



7:03 PM · Jan 6, 2021 · Twitter for iPhone

A few moments later, the defendant tweeted "I do have footage of people telling me not to

go in [to the Capitol] because a lady just got shot and I said oh well.  And all my friends we are

100% we didn't care we're here for the USA.  Give me liberty or give me death.  No joke."

For the defendant, the attack on the Capitol was "one of the best days of my life."

11



**dotJenna**
@dotjenna

...

We just **stormed** the Capital. It was one
of the best days of my life.

3:42 PM · 1/6/21 · Twitter Web App

Following the riot, the defendant continued to make comments on various social media platforms minimizing and denying the violence that occurred, falsely minimizing her entry into the Capitol and denying that she engaged in any wrongdoing. In personal messages, the defendant initially denied entering the Capitol at all.   In an interview recorded on January 8, 2021 for Spectrum news, the defendant claimed she got no further than the doorframe of an entrance into the Capitol building (at 2:48 minutes),[7] and there was no violence when she was at the Capitol because the police already had everything under control (at 3:55 mintues).[8]  On January 11, 2021 in an instant message on Facebook, the defendant claimed falsely:

From: █████████Jenna Ryan

Only took one step into the building



1/11/2021 8:45:41 PM(UTC-6).

In her 43-minute recorded interview with NBC's Cynthia McFadden, the defendant maintained that "I did not know I was breaking the law" (at 26:08 minutes); she did not really want to go to

---

[7] The Spectrum interview appears at https://www.youtube.com/watch?v=wm7EjLmeWjA.
[8] But compare the defendant's own recording from January 6 at 4:22 p.m., where the defendant comments on windows being broken, announces that a war is starting, and states "really we could go in there," referring to the Capitol, because "the military's not gonna come."

the Capitol (at 13:16 minutes); she felt "perfectly innocent in everything I have done" (at 23:56 minutes); and she wanted a pardon for all nonviolent January 6 protestors because "it's like a witch hunt" for a misdemeanor (at 31:30 minutes). In a January 13, 2021 interview with Fox News,[9] the defendant maintained that by joining the riot, "I was doing my duty." To her, January 6 "was a protest" and she stated "I do not feel that I did anything wrong; in fact, I felt that I did something noble and I'm proud of being there, I have no shame to be there; I feel very persecuted." As late as June, on the platform Gettr.com, the defendant blamed the same conduct that she had encouraged on the FBI and antifa.

Her comments prompted support from some and harsh criticism from others. In response to one critic suggesting she was going to jail, the defendant responded that she was "definitely not going to jail" because she has "blonde hair," "white skin," and a "great" job and future.[10]



**Jenna Ryan**
@dotjenna

Definitely not going to jail. Sorry I have blonde hair white skin a great job a great future and I'm not going to jail. Sorry to rain on your hater parade. I did nothing wrong

9:43 AM · Mar 26, 2021                                        ⓘ

*The Charges and Plea Agreement*

On January 14, 2021, Jennifer Leigh Ryan was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On January 15, 2021, she surrendered to agents at the federal courthouse in Plano, Texas. On February 16, 2021, the defendant and her codefendants were charged by a four-count Superseding Information with

---

[9] The interview is available on YouTube at https://youtube.com/watch?v=gYssqp41DkU.

[10] This expression of impunity was not isolated. On January 12, 2021 at 11:30 p.m., the defendant wrote in a personal message from a gmail account: "Oh well I can always say I've done it all. I've done everything including having a criminal trial and getting off Scott free because I will get off anything to [sic] try to pin on me." Not surprisingly, in her January 13 interview with Fox News, the defendant stated that "I have no fear of getting arrested."

violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  ECF 18.  A second superseding information against all defendants added an additional charge against Schwab and was filed on June 7, 2021.  ECF 34.  On August 19, 2021, the defendant pleaded guilty to Count Four of the Second Superseding Information which charged a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating or Picketing in a Capitol Building.  ECF 38.  In her plea agreement, the defendant agreed to pay $500 in restitution to the Department of the Treasury. *Id*. at 6.

### III.    Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment, PSR ¶ 99, a fine of up to $5,000, PSR ¶ 111, and a mandatory $10 special assessment, PSR ¶ 112. The defendant must also pay restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it.  18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct,

§ 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each individual person who entered the Capitol on January 6 did so under the most extreme of circumstances. As a person entered the Capitol, each would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob.  Depending on the timing and location of the approach, each rioter also may have observed extensive fighting with law enforcement and, like the defendant, would have smelled chemical irritants in the air. Make no mistake, no rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum.  This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited

evidence of remorse or contrition.  While these factors are not exhaustive or dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The defendant drew on her considerable experience as a social media influencer to promote violence before her arrival at the Capitol.[11]  *See, e.g.,* PSR ¶ 79(g) (listing defendant's ranking as the 87th most influential person online in a 2010 *Fast Track Magazine* article).[12]  The defendant understood the impact that her statements would have on others. She sought to persuade others to "fight" with the goal of disrupting a presidential election.  Thus, the defendant's intrusion into the Capitol has greater significance than someone who simply entered and then left.  Moreover, she went to the Capitol explicitly and presciently acknowledging that the force of numbers itself was a tool for overcoming the officers guarding the Capitol, tweeting from her hotel that "there is [sic] more of us then there are of them."  As she stated in a video depicting her approach to the Capitol, "we're gonna be breakin' those windows we're gonna have to be dealing with the tear bombs . . .".  Accordingly, the defendant's participation in the riot cannot be placed at the lowest end of the spectrum of conduct on January 6.[13]

---

[11] A survey of the defendant's social media and online footprint reveals her considerable following.  A review of an archived copy of her Twitter page (@dotjenna) from January 19, 2021 indicates that she had "18.8K" followers at that time (accessible at https://web.archive.org/web/20210119103239/https://twitter.com/dotjenna?lang=en). Her self-help website, selfloveu.net,  has had a static banner listing "56.8K" subscribers and 3,828,231 views for some time.  *See* http://selfloveu.net/youtube-channel/ (last accessed on October 28, 2021).  However, the associated Youtube channel, as of October 22, 2021, lists "66K" subscribers, with several of her videos having been viewed more than 60,000 times.  *See* https://www.youtube.com/results?search_query=selfloveu. The defendant also highlighted to the presentence report writer that one of her makeup videos on Instagram (@dotjenna) has over 111,000 views. PSR ¶ 69(b)(ii).  In a January 13, 2021 text message exchange with a third party, the defendant attached a screenshot of a tweet showing her photograph by the broken Capitol window to document that "I have 242,000 likes."

[12] In the Today Show interview cited above, the defendant stated that "I just know how to share online to get people's attention."

[13] Implausibly, the defendant maintained during the McFadden interview that "violence did not cross my mind" (at 10:44 minutes).

The defendant's knowledge of violence at the Capitol did not deter her from entering the building through the sound of alarms and the smell of tear gas, and as she passed next to broken windows.  Indeed, she wanted to share these details with others, streaming them live on Facebook and taking photographs for Twitter. Immune to the stature of her location or the gravity of her endeavor, the defendant joined a mob not only to support a disruption of the peaceful transfer of power, but also for the promotion of her services as a real estate agent by stating, "I will sell your f***cking house".  A week later, she contemplated that publicity from January 6 would place her in "every magazine in the world" and it was time to "get ready for business."  For the defendant, a mob attack at the core of the nation's democracy was an appropriate opportunity to exploit for business development.  Her cavalier behavior shows indifference to her own unlawful activity and its seriousness, despite her demonstrable recognition of its potential for harm.

The defendant intruded into the Capitol willfully; she was not propelled inside by pressure from a crowd, and in fact, her determination to gain entry rose to a level where "life or death, it doesn't matter."  As she entered, others exited. The defendant could have chosen, but did not, to reverse course.  As she entered, the defendant also detected tear gas.  She had no reason to believe that her presence was appropriate or welcome.

While inside, she shouted, "Fight for Trump!" and was positioned to hear shouts demanding destruction of the Speaker's office.  According to the defendant, she chose to remain inside the Capitol until "pepper spray," not remorse, forced her out.[14]  Once outside and reunited with her codefendants, she again posted a smiling, celebratory video, amused that she had reached

---

[14] In a tweet and in the Today Show television interview (at 15:28 minutes), the defendant attributes her exit from the Capitol to pepper spray.  In a January 6 tweet, the defendant states that the attack on media equipment happened after "we got pepper sprayed out of the capital [sic]."

the other side of the Capitol building.  This video ends as the defendant appears to approach the Capitol again, stating, "c'mon let's do it".  Whatever she intended to do, after her exit from the Capitol's interior, she chose to remain in proximity to the building's entrance, encouraging rioters who tried to push their way in and suggesting that others could enter without intervention from the military.

The defendant's endorsement of violence extended to loss of life and damage to property and continued even outside of the Capitol building.  At 7:01 p.m., she posted a smiling self-portrait by a broken Capitol window, captioned with a warning that the news media would be next; an hour later, she posted the "cool moment" when rioters, including codefendant Schwab, damaged media equipment.  At 7:07 p.m., the defendant appeared to acknowledge the fatal shooting of a rioter as an acceptable collateral consequence because they "were there for the USA."[15]    Before the morning rally, during the riot, and after her departure from the crowd and the intensity inside the Capitol building, the defendant supported and even threatened violence.  These circumstances also push assessment of the defendant's conduct away from the least serious end of the offense conduct spectrum.

After the riot, the defendant's statements show a near total lack of remorse.  According to her posts, January 6 was the best day of her life. On January 7, she tweeted that "We had to storm the US Capital [sic].  We were very sweet about it, everyone saying excuse me, etc. … But we had to do it.  Pence let us down.  Those cronies in there are stealing our country." On Twitter and in televised interviews, the defendant described herself as a patriot who did nothing wrong and who

---

[15] Several hours later, at 11:41 p.m., after receiving reactions to this tweet, the defendant adopted a more moderate tone, stating, "The woman was murdered.  She did nothing.  My heart is hurting for her, but she was prepared for the risk.  She died a martyr . . .."  Even here, however, the message shows no sense of wrongdoing by the mob, or by extension, the defendant herself, who joined and encouraged the mob.

was deserving of a presidential pardon.  In March, months after the riot, the defendant tweeted

again, "I did nothing wrong."

The defendant experienced backlash after the riot, including critical statements on social

media.  She reported threats to the local police, and alleged that she experienced "doxxing," that

is, the unauthorized and retaliatory online disclosure of her personal information.  She had to form

a new real estate company with a different name.  In this context, the defendant has stated to

Probation that she wants to put "Capitol events" behind her and that they are "not something I'm

proud of at all."  PSR ¶ 32.  Most of her 28-line statement to Probation, however, addresses the

defendant's own preferences and goals, her desire to be uplifting, and her objections to bullying

and defamation and to "Cancel culture."  In an oral interview with a Probation officer, the

defendant said she doubted she would be arrested at all and described herself as a victim.  PSR ¶¶

30-31. Her statements raise questions over whether the defendant regrets the outcomes of her

offense as opposed to feeling any remorse for committing the offense itself.[16]

Moreover, the defendant has mispresented her conduct to Probation by contending that

"she did not even know there was a riot when she arrived" at the Capitol.  PSR ¶ 29.   Her

statements prove otherwise: early in the morning of January 6, the defendant described the

upcoming rally at the Ellipse as a "prelude" to "war."  She reviewed a tweet describing a

destructive breach of the Capitol that overwhelmed police.  She recorded herself watching

television coverage of the riot that depicted rioters climbing walls at the Capitol.  From her hotel

room, she tweeted "We are here!!!  We are taking it!!!  There is more of us than there are of them."

She quickly followed with a video statement that "we're gonna go down and storm the Capitol;

---

[16] Also during the Today Show interview, the defendant remarked that "I have no guilt in my
heart" (at 24:09 minutes) and that she feels like a martyr (at 38:33 minutes).

they're down there right now and that's why we came. . ." followed by another video stating that

she was going to war.  If that were not enough to show the defendant's awareness of a mob

overwhelming police, as she approached the Capitol, she posted another video where she stated

"we're gonna be breakin' those windows we're gonna be havin' to deal with the tear bombs tear

with the gas bombs because we have to because they're takin' our sh**."   This lack of candor

with the Court's own officers certainly does not weigh in favor of a more lenient sentence.

Finally, the defendant has publicly mischaracterized her own role in the riot, making false

public statements indicating that she barely crossed the threshold to the Capitol when photographs

and video show otherwise.  She tweeted a threat to come after the media above her photo of the

broken window, followed by praise ("a cool moment") for those who subsequently damaged press

equipment consistently with that threat.  In the aftermath of a violent and fatal riot, the defendant

has falsely denied that there was violence, asserting that the rioters were "sweet."  Accordingly,

the nature and the circumstances of this offense establish the clear need for a custodial sentence in

this matter.

### B.  The History and Characteristics of the Defendant

As set forth in the PSR, the defendant's criminal history consists of misdemeanors that

include an assault for which she was fined and a conviction for driving with a suspended license,

resulting in a sentence of nine months' probation and a fine.  PSR ¶¶ 37, 38.  Experiencing

probation and the imposition of fines in the past was not sufficient to deter the defendant from

joining a riotous mob seeking to disrupt certification of a presidential election.  Thus, while the

defendant has been compliant with the terms of her pretrial release, PSR ¶ 8, her history calls for

more than a probationary sentence.

Moreover, the defendant has not consistently paid her taxes, with a history of federal and state tax liens from 2013 and 2016 that caused a deficiency of more than $35,000 in back taxes that was not resolved until April, 2021. Despite her own history of tax delinquency, the defendant recorded herself, before release of tax liens on her own assets, on the Capitol steps declaring that she "was tired of paying taxes" to "crooks."

The PSR reports that the defendant had a difficult and traumatic childhood. According to the PSR, in the defendant's judgment, she has worked through that history. *See* PSR ¶66. On January 13, 2021 in messages with a concerned friend recovered from her cell phone, the defendant maintained "I don't need help" and "I'm Quite [sic] self sufficient." She has employment as a real estate agent, has worked as a life coach, and has been considered by herself and by others as an "influencer" who has successfully utilized radio and social media to establish a following. While the defendant's professional accomplishments can be commended, they do not excuse the offense she committed or offset its gravity. And in this case, the defendant's experience with, understanding of, and access to various media outlets such as radio, television, and social media casts her activity on January 6 in an even more disturbing light, because of both her increased ability to promote violence and to mislead the public about the events of January 6.

What might be the most troubling aspect of the defendant's character is her belief, stated explicitly, that she will not be held to account for her conduct. She publicly sought a presidential pardon for her crimes while also blaming others, such as the FBI and "antifa," for the violence and destruction of property that occurred on January 6 without acknowledging her own considerable contribution to the belligerence. Then, in March, she proclaimed on social media that because of her race, her appearance, and her economic position she would avoid incarceration. This belief that she will not face significant sanction simply because of who she is and regardless of whether

21

punishment is deserved means that there is little, while she persists in this belief, to deter the defendant from similar or additional wrongdoing. To be clear, the defendant is free to express her beliefs that she is unaccountable, no matter how offensively those beliefs are stated. But once expressed, this Court is free to consider her statements and beliefs in order to meet the statutory requirement to evaluate the defendant's characteristics and determine the need for a sentence that will deter the defendant and others from engaging in similar violations. Here, the defendant's sense of impunity, indifference to violence and denial of wrongdoing call for a custodial sentence.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[17] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases arising out of the riot on January 6, 2021, including in misdemeanor cases. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

Offenses that attack our democracy like the riot at the Capitol are rare, if not unprecedented. This defendant's sense of impunity is striking, not just because she explicitly holds herself above

---

[17] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

the law but because she believes that her social status and race protect her from accountability. Any sentence she receives, however, must promote respect for the rule of law that this defendant believes she can disregard on account of who she is. *Cf.* 28 U.S.C. § 994(d) (requiring the United States Sentencing Commission to assure that its guidelines and policy statements are "entirely neutral as to race, sex, national origin, creed and socioeconomic status of offenders"); *United States v. Lopez*, 938 F.2d 1293, 1297 (D.C. Cir. 1991) (observing that Congress intended to counter any suggestion that preferential treatment for defendants of a particular race or level of affluence was appropriate, or that defendants should face prison because they are poor or uneducated).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that

> [the defendant] and others caused that day goes way beyond the several-hour delay
> in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven

months ago for the United States and our diplomats to convince other nations to pursue democracy.

It means that it will be harder for all of us to convince our children and our grandchildren that

democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I

don't think that any plausible argument can be made defending what happened in the Capitol on

January 6th as the exercise of First Amendment rights."). And it is important to convey to future

rioters and would-be mob participants—especially those who intend to improperly influence the

democratic process—that their actions will have consequences. There is possibly no greater factor

that this Court must consider.

*Specific Deterrence*

Ample evidence shows a need for specific deterrence in this case. The defendant has

continued to deny wrongdoing, even as recently as her September 2, 2021 interview with Probation

in which she falsely denied knowledge that a riot was occurring at the Capitol before her arrival

there. On social media and in television interviews, she has proclaimed that she did nothing wrong.

Rather than acknowledge her own actions and choices, she has described "storming" the Capitol

as justified and necessary. The defendant has not shown remorse. When contrasted with the

sampling of statements in this paragraph, the reference in her written statement of September 10

to Probation that she is "not proud" about the "Capitol events" (which previously represented "the

best day" of her life) can rightly be viewed with skepticism. *See Mazzocco*, 1:21-cr-00054 (TSC),

Tr. 10/4/2021 at 29-30 ("Mr. Mazzocco's remorse didn't come when he left the Capitol. It didn't

come when he went home. It came when he realized he was in trouble. It came when he realized

that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did.  And that is when he felt remorse, and that is when he took responsibility for his actions").  Even if the defendant is found to be remorseful, her remorse did not develop quickly, and does not appear to be profound.  It did not surface until months after her arrest and guilty plea in the form of a brief remark made to Probation on September 10.  Thus, it should not carry great weight.

Perhaps the most compelling need for specific deterrence arises from the defendant's misguided belief that she is above the law, or at least insulated from incarceration.  According to the defendant, she is:]

> Definitely not going to jail.  Sorry I have blonde hair white skin a great job a great future and I'm not going to jail.  . . . I did nothing wrong.

A defendant who believes she is immune from strict punishment because of her race and physical appearance may reoffend because the consequences for wrongdoing will never, in the defendant's mind, be severe even when severity is merited.  Rather than hope for some chance the defendant will learn on her own that she is indeed accountable, this Court should impose accountability through a sentence that will refute the defendant's sense of impunity and thereby protect the public from the risk of her future crimes, *see* 18 U.S.C. § 3553(a)(C).

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on law enforcement officers, to conspiracy to corruptly interfering with Congress.  Each offender must be sentenced based on their individual circumstances, but with the backdrop of January 6 in mind.  Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting

a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lesser end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[18] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19.

While the number of sentenced defendants is low, we have already begun to see meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration, while those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home confinement. After a review of the applicable Section 3553(a) factors, the government believes that the defendant's conduct falls in the former category.

The defendant came to D.C. expecting violence and predicting "war;" publicized her intent to storm the Capitol; converged on the Capitol after learning rioters were there and excitedly broadcast that police were outnumbered; entered the Capitol and apparently left only after

---

[18] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its prior agreement to recommend probation in these cases. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

experiencing the effects of tear gas; celebrated the violence required to breach the Capitol; threatened and approved of violence outside the Capitol, particularly against the news media; showed no remorse in the months that followed and declared January 6 to be the best day of her life;  spread false information to the public; lied to Probation; has a criminal history which demonstrates that fines and probationary sentences did not deter the defendant from misconduct in this case; does not consistently pay her taxes; and believes herself to be immune from punishment because of her appearance and socioeconomic status. Thus, this defendant should not be compared to those who obtained a home confinement or probationary sentence.

**V.      Conclusion**

Sentencing here requires that the Court carefully balance the various factors set forth in 18 U.S.C. § 3553(a).  As detailed above, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Jennifer Leigh Ryan to incarceration for 60 days and $500 in restitution. Such a sentence protects the community, promotes respect for the law, considers the failure of past probationary sentences to deter the instant offense, and deters future crime by imposing restrictions on her liberty as a consequence of her behavior, while recognizing her early plea of guilty and troubled past.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY


By:    *s/ Karen Rochlin*
KAREN ROCHLIN
DC Bar No. 394447
Assistant United States Attorney Detailee
U.S. Attorney's Office

27

99 N.E. 4th Street
Miami Florida 33132
(786) 972-9045
Karen.Rochlin@usdoj.gov